OPINION OF THE COURT
Bernard J. Fried, J.
This 365-count indictment charges 45 defendants, although not all are named in each count, with the crimes of conspiracy in the fifth degree (Penal Law § 105.05), commercial bribe receiving in the first and second degrees (Penal Law §§ 180.03, 180.00), and scheme to defraud in the first degree (Penal Law § 190.65).
At issue is the applicability of these statutes to allegations that the personal injury insurance industry is rife with corruption among the insurance company adjusters, the plaintiff s personal injury lawyers, and a group of persons denominated as the middlemen. It is the People’s theory that in order to expedite the processing and settlement of personal injury claims, in a system where an individual claim may take years to resolve, a corrupt scheme developed whereby plaintiffs attorneys would kick back a designated percentage of their settlement fee, through the middleman, to an adjuster. This kickback was split between the middleman and the adjuster. It is not alleged that the settlements obtained by this system were other than what would have been reached in the ordinary course of business, absent the kickback.
Commercial Bribery
Article 180 of the Penal Law separately treats the giving of a commercial bribe and the receiving of a commercial bribe, which analytically are the opposite sides of the same transaction. Originally enacted as a class B misdemeanor (L 1965, ch 1030), there were two subsequent amendments to the statutory scheme concerning commercial bribery: In 1976, the Legislature created first and second degree commercial bribery crimes, making the former a class A misdemeanor, when the bribe is in excess of $500 (L 1976, ch 458). Thereafter, in 1983, the Legislature raised the first degree level to a class E felony, where the "value of the benefit [the bribe] * * * exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars.” (L 1983, ch 577, § 1.) By the same amendment, all other commercial bribes, regardless of value or economic harm, the *816 second degree level, were raised to a class A misdemeanor. (L 1983, ch 577, § 1.)
There are three basic arguments: (1) that since there is no claim of an inflated settlement, there has been no loss to the insurance company and, therefore, as a matter of law, there must be a failure of proof concerning the element of economic harm to the insurance company exceeding $250 requiring, at the worst, reduction of the felony charges to misdemeanors; (2) that the alleged payments were not made in order to influence the adjuster’s conduct as an employee of the insurance company; and (3) that the alleged payments do not constitute a "benefit”, as contemplated by the statute (either exceeding $1,000 [first degree] or "any” benefit [second degree]) because that portion of the payment kept by the middleman must be deducted from any calculation as to whether the statutory threshold has been met.
1. Economic Harm
Turning to the alleged lack of economic harm, the People respond that the amount of economic harm must be calculated as the total amount of money that the plaintiffs attorney pays to the middleman, regardless of the payment to the insurance adjuster. They assert that "when the bribe is a kickback, and therefore paid with the employer’s own money, then the bribe itself also constitutes the harm.” Contrariwise, the defense claims that there has been no actual economic harm and that the People are merely relying upon economic theories, what one defense attorney calls "metaphysical proof”. This is because, so the argument runs, to permit this theory of prosecution would be to relieve the People "of their inescapable burden of proving 'economic harm’ in each individual count charged;” and "lacks financial logic, since * * * any payments were not 'built in’ to the settlements, but instead were deducted from the attorney’s share of the settlement.”
The statutory economic harm requirement was added in 1983 when first degree commercial bribery was raised to a class E felony, although the term economic harm was not defined in either the statute and/or in the legislative history. Indeed, at the time of the amendments, Attorney-General Robert Abrams, who considered the bill to amend the commercial bribery statutes "part of [his] legislative program,” and Senator James J. Lack, the Senate sponsor of the amendment, both thought that by adding the concept of economic harm, they were creating an affirmative defense. The Attorney-General wrote that *817 "[l]ack of economic harm to the employer or principal is an affirmative defense to both commercial bribery and commercial bribe receiving in the first degrees.” (Attorney-General’s Legislative Program, at 1, Bill Jacket, L 1983, ch 577.) During the Senate debate on the bill, Senator Gold asked Senator Lack, "[c]an you tell me the philosophy behind creating an affirmative defense in a bribery situation? Is it based upon economic harm? How does that all get determined * * * Am I to understand that if there is a situation of commercial bribery, but it’s a bribery between two competitive interests who may be at the same price and one interest decides that, in order to get the contract, they will make a commercial bribe, that since the employer may not suffer economically since it’s between competing interests at the same price, that we are creating an affirmative defense?” To which Senator Lack replied, "that is correct. If it did not cause economic harm, it is an affirmative defense in a commercial bribery situation.” (Senate debate transcripts, at 9759-9760.)
However, since the statute did not declare lack of economic harm to be an affirmative defense, an affirmative defense was not created, nor was there created an ordinary defense (Penal Law § 25.00 [1]). Rather, of course, as the statute was written, economic harm constituted an element of the first degree offenses. This legislative misapprehension of the significance of the term economic harm may explain the absence of a statutory definition and may explain the difficulty that this language presents, when viewed as an essential element of these crimes. But this history does support the interpretation that in a kickback case, the amount of the kickback would constitute economic harm, unless it arises in a factual situation such as in the example suggested by Senator Gold or some other uncommon situation.
This becomes clear from further examination of the legislative history. Attorney-General Abrams indicated that "[a] typical example of a commercial bribe is a 'kickback’ paid by a manufacturer to the purchasing agent of a retailer to ensure an outlet for his product * * * The obvious result of commercial bribery is increased costs to consumers. For example, when a seller bribes a purchasing agent the purchase price is inevitably increased by the amount of the bribe. The increased cost due to the bribe is passed on to the consumer in the form of higher prices” (Attorney-General’s Legislative Program, at 1, Bill Jacket, op. cit.). Edward J. Kuriansky, the Deputy Attorney-General for Medicaid fraud control, wrote that *818 "kickbacks * * * significantly increase the * * * costs of health care” (letter to Hon. Alice Daniel [Counsel to Governor], Bill Jacket, op. cit). This legislative concern over the effect of kickbacks is not disputed.
What is disputed is whether the kickback itself can be used to satisfy the statutory requirement that there be economic harm exceeding $250. As to this issue, there have been found no reported decisions. While there is also no equivalent Federal statutory requirement of economic harm, there are numerous Federal decisions concerning kickbacks, which have most commonly arisen in the context of a mail fraud prosecution (18 USC § 1341). However, in the wake of McNally v United States (483 US 350 [1987]), and its "crabbed” construction of the mail fraud statute (supra, at 374 [Stevens, J., dissenting]), permitting prosecutions only when the alleged victim had been deprived of money or property, and not the intangible right to honest government services,[1] some Federal circuit courts found a McNally-type loss in a pure kickback case, based upon an implication of a money or property interest, while other circuits required a cognizable money or property loss.
Following the McNally decision (supra), in United States v Little (889 F2d 1367 [5th Cir 1989], cert denied 495 US 933 [1990]), although there was no showing of actual loss since the contractor was the low bidder who sold for the agreed-upon price less the kickback amount, the Fifth Circuit held that the kickback equalled the loss (supra, at 1368). Little relied on a pre-McNally Fifth Circuit case, United States v Fagan (821 F2d 1002 [5th Cir 1987], cert denied 484 US 1005 [1988]), where an offshore drilling company employee leased boats for his employer’s use from the defendant, and in exchange for the business the employee was paid a kickback. The defendant claimed that he had absorbed the kickback costs himself. As one of several grounds for its holding, the court held that the employer was deprived of "the economic value of possibly being able to rent the boats from [defendant] for less, had it known that he was willing to accept less”. (Supra, at 1011, n 6.)
Similarly, the Seventh Circuit, in Ranke v United States (873 F2d 1033 [7th Cir 1989]), relying on Fagan (supra) and its own *819 pre-McNally decision, United States v George (477 F2d 508 [7th Cir 1973], cert denied sub nom. Yonan v United States, 414 US 827 [1973]), held that where an employee accepts a kickback, the harm to the employer is the amount of the kickback. This decision echoed the earlier George case (supra), where the Seventh Circuit held that even though the giver of the kickbacks did not inflate the price to cover the monies paid to the employee, but rather had absorbed their cost, "[t]here was a very real and tangible harm to [the employer] in losing the discount or losing the opportunity to bargain with a relevant fact before it.” (Supra, at 513; see also, United States v Sleight, 1988 WL 104661 [D NJ, Oct. 4, 1988, Thompson, J.], affd 875 F2d 312 [3d Cir 1989] ["The fact that a jury found that a kickback scheme occurred is sufficient to show that a property deprivation occurred”]; but see, United States v Johns, 742 F Supp 196, 203 [ED Pa 1990], affd 972 F2d 1333 [3d Cir, Pa 1991].)
The Second Circuit’s decision in United States v Mittelstaedt (31 F3d 1208 [2d Cir 1994], cert denied sub nom. Johnsen v United States, 513 US 1084 [1995]) is cited by the defense to counter the contention that the amount of the kickback, itself, without inflation of the insurance settlement, can constitute economic harm. In Mittelstaedt, a town official received a bribe in connection with the sale of real property to the town for a substantial profit over the original purchase price by the defendant and his conspirators. However, the price paid by the town was not inflated by the bribery scheme. The court held that since there was no evidence that the price was influenced "in any manner”, the conduct "di[d] not constitute mail fraud.” (Supra, at 1219.) There was no discussion of the cases discussed above, which would point to a contrary result, and which I find to be persuasive. Moreover, the conduct in Mittelstaedt predated the congressional amendment following McNally (supra); certainly, under a pre-McNally analysis, or postcongressional enactment of title 18, § 1346, the mail fraud conviction in Mittelstaedt would have been sustained.[2]
*820 The actual holding of McNally (supra), as discussed, was that the Federal mail fraud statute did not prohibit schemes to deprive citizens of what was described as the intangible right to honest government, which was not "money or property.” In the wake of McNally, various circuits adopted differing approaches to deal with McNally-type property loss issues before the 1988 congressional overruling of that decision. While the mail fraud statute, and its decisional authority, has direct relevance to the scheme to defraud counts, since, as stated by the Court of Appeals, it was "modeled” after the mail fraud statute, we should "look to Federal precedents applying similar statutory language” (People v First Meridian Planninq Corp., 86 NY2d 608, 616 [1995]); these cases, as discussed, also inform a proper construction of economic harm. In this regard, I believe, it is noteworthy that the pr e-McNally broad view of property loss would have found the kickbacks alleged here cognizable under the mail fraud statute.[3]
In conclusion, I believe that the People are correct in urging that where an employee accepts kickbacks, the amount of the monies paid constitutes, in most cases, the amount of actual pecuniary harm suffered by the employer. There is nothing subtle about this inescapable result. Because, to borrow from Judge Learned Hand, while "[i]t may be impossible to measure his loss by the gross scales available to a court * * * [nevertheless the employer] has suffered a wrong; he has lost his chance to bargain with the facts before him.” (United States v Rowe, 56 F2d 747, 749 [2d Cir 1932], cert denied 286 US 554 [1932]; but see, United States v Dixon, 536 F2d 1388, 1390 [2d Cir 1976] [citing subsequent Second Circuit cases "declin(ing) to follow the letter of Judge Learned Hand’s dictum”]; United States v Starr, 816 F2d 94, 100-101 [2d Cir 1987].) This is what the People have alleged. It is this that constitutes economic harm.
2. Intent To Influence Employee’s Conduct
The second argument is that even if the payments were made by the attorneys through the middlemen, they were not made *821 in order to influence the adjuster’s conduct as an employee of the insurance company, as required by the commercial bribing statutes.
Most astonishingly, it has been argued, seriously I think, both in the briefs and at oral argument, that since the payments, often amounting to thousands of dollars, were made by the attorneys from their fees received as a result of the settlements, they should be considered analogous to the tip given in a restaurant "to get seated faster”. This argument, that the alleged secret payments, which were undisclosed and unknown to the adjuster’s employer, are akin to the tip in a restaurant, merits no discussion; its fallaciousness is self-evident.
However, a serious argument is made that the payments cannot constitute a bribe, because, at the very least "the insurance company adjusters were expected by their employers, as part of their job duties, to settle cases expeditiously. Settling cases expeditiously is not a matter which is in the insurance adjusters’ discretion; it is something [they are] required to do by [their] employer.” Relying upon People v Jacobs (309 NY 315 [1955]) and People v Graf (261 App Div 188 [1st Dept 1941]), it is contended that since the adjusters were required to settle cases quickly, this was not a discretionary act and hence there could be no violation of the Penal Law.
In Jacobs (supra), the Court found it not to be a bribe where a photographer paid an employee of a ship to provide a passenger list which the employee was otherwise required to give to various authorities. Moreover, the employee had informed his employer of the defendant’s payment and the employer had also been known to release such lists for publicity purposes. Thus, the Court held that since this was a nondiscretionary act, it was not cognizable under the former Penal Law, which required that the employee act in "a particular manner, in relation to his * * * employer’s * * * business” (Penal Law former § 439). This is unlike the current statute which requires only that the bribe payment be given "with intent to influence [the employee’s] conduct in relation to his employer’s * * * affairs.” (Penal Law §§ 180.00-180.08.)
It seems obvious to me that if the adjuster accepts payment to expedite the settlement of a particular personal injury case, the receipt of the payment has influenced the conduct of the adjuster as it relates to the adjuster’s employment. The employee has chosen to resolve one case, because of the bribe, and not another. It is sophistry to argue that as long as settlements are not inflated, the adjuster fulfills his duty to the *822 employer since he is required to settle all cases quickly, regardless of the order in which cases are chosen for settlement or whether the case is settled at all.
3. Statutorily Required Benefit
Essential to the commercial bribery statutes is that a "benefit” is conferred, offered, or agreed to be conferred upon the employee. The Penal Law defines "benefit” as "any gain or advantage to the beneficiary and includes any gain or advantage to a third person pursuant to the desire or consent of the beneficiary.” (Penal Law § 10.00 [17].) As pointed out by Judge William C. Donnino in his Practice Commentary: "The term 'benefit/ which is defined broadly to include any gain or advantage * * * is at the heart of the bribery statutes”. (McKinney’s Cons Laws of NY, Book 39, Penal Law § 10.00, at 23 [1987].)
It is argued that "[u]nder the plain language of the felony bribery statutes, only that portion of the alleged bribe payment which is actually 'conferred] * * * upon’ the employee * * * may be counted toward the $1,000 threshold amount.” Therefore, since it is alleged that the plaintiff’s attorney paid the expected percentage of the settlement amount directly to the middleman, who kept one half, and gave the balance to the adjuster, the defense argues that the amount retained by the middleman cannot be used towards satisfaction of the $1,000 statutory minimum amount. I disagree.
The statutory definition of "benefit” explicitly "includes any gain or advantage to a third person pursuant to the desire or consent of the beneficiary.” These words make it clear that if either the adjuster or middleman desired or consented that the other retain a portion of the bribe that was bargained for, the total amount would satisfy the statute. This construction does not require further discussion.
Finally, with regard to the issue of whether the statutory threshold has been met, it is also argued, citing to People v Ryan (82 NY2d 497 [1993]), that the particular plaintiff’s attorney did not actually know "that the amount of the bribe to be paid to the employee * * * would be in excess of $1,000.” Ryan, however, dealt with a statute which contained an express provision that one act "knowingly” (at 499), and it was in the context of this language that the Court required actual knowledge. There is no such language in the commercial bribing provisions; rather the only culpable mental state is that the actor act with an "intent to influence” improperly the conduct of an *823 other. Thus, contrary to the defense argument, what is required is not actual knowledge of the amount of the bribe, but the requisite specific intent, coupled with proof that the benefit conferred exceeded $1,000.
With regard to the commercial bribing statutes, it is further contended by the defendants, who comprise the group of so-called middlemen, that to charge them with both commercial bribing and commercial bribe receiving in the same transaction would violate Penal Law § 20.10, which provides that criminal liability does not attach to accessorial conduct which "is of a kind that is necessarily incidental” to commission of an offense. To understand this issue, it is necessary to recall that the indictment charges the plaintiffs’ attorneys only with commercial bribing and the adjusters only with commercial bribe receiving, since under section 20.10 one cannot be criminally liable for the conduct of another "when his own conduct, though causing or aiding the commission of such offense, is of a kind that is necessarily incidental thereto.” As Judge Donnino relates in his Practice Commentary: "the drafters [of the Penal Law] posited that the crime of bribe giving by A to B is necessarily incidental to the crime of bribe receiving by B”; hence, each actor is responsible only for his own conduct. (McKinney’s Cons Laws of NY, Book 39, Penal Law § 20.10, at 53 [1987].) Consequently, A is not chargeable with bribe receiving, and B is not chargeable with bribe giving, even though they would be under the general principles of Penal Law § 20.00.
However, with regard to the middlemen, the situation changes from a two-person transaction to a three-or-more-person transaction. In such case, analytically and legally, the middleman, on the one hand, is acting as an accomplice of the plaintiff’s attorney, aiding and abetting the bribe giving, and on the other hand, is acting as an accomplice of the insurance adjuster, aiding and abetting the bribe receiving. (Penal Law § 20.00.) This duality of purpose, or of conduct, is not what section 20.10 envisions or prohibits; what is prohibited is conduct which is "necessarily incidental” to the offense as in the example quoted above. It is the payment by the plaintiff’s lawyer that is "necessarily incidental” to the bribe receiving by the adjuster, and it is the receipt of the payment by the adjuster that is "necessarily incidental” to the bribe by the plaintiff’s lawyer. This analysis is not changed, as urged by the defense, because at oral argument the People asserted that the "middlemen were an essential part of [the] transaction”.
Under the facts alleged here, the middleman’s participation was integral to the success of the corrupt commercial bribing *824 transaction, but this does not transform the middleman’s conduct to that which is "necessarily incidental”. Bribe giving is directed at the bribe giver; bribe receiving is directed at the employee. When a third person is added to the calculus, that person’s conduct may create criminal liability simultaneously as both an accomplice to the bribe giver and the bribe receiver. Of course, the separate crimes of commercial bribing and commercial bribe receiving would be concurrent counts for sentencing purposes. (See, Penal Law § 70.25 [2]; see also, CPL 300.30 [3].)
Thus, with regard to the commercial bribing and receiving counts, if the People have presented proof before the Grand Jury in accordance with their theory of prosecution, then the evidence would be sufficient.
Scheme to Defraud
The crimes of scheme to defraud in the first degree (class E felony) and second degree (class A misdemeanor) (Penal Law §§ 190.65, 190.60) were originally enacted in 1976, following legislative determination that the traditional forms of larcenous crimes were inadequate to prosecute "various forms of fraud, including consumer fraud.” (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 190, at 423 [1988].) The original statute made it a felony where the scheme was against 10 or more persons; otherwise it was a misdemeanor, and neither had any dollar limitations. In 1986, the first degree offense was raised to a class E felony, and it was amended to include schemes against more than one person, if property in excess of $1,000 is obtained "from one or more such persons”. (Penal Law § 190.65 [1] [b].)[4] The 10-person provision was retained as an alternative theory of felony prosecution (Penal Law § 190.65 [1] [a]), and the misdemeanor offense remained intact. (L 1986, ch 515, § 10.) It is this amended statute, specifically the portion which penalized a scheme against at least one individual, and involving property obtained having a value of over $1,000, that is charged in counts 324 to 365.
At issue is whether this statute applies to the scheme alleged by the People. Similar to the challenge to the use of the *825 commercial bribing and receiving sections, there is a threshold challenge to the applicability of the scheme to defraud statute.
The defense contentions are: (1) that the scheme to defraud statute was not intended to be used in a case of this sort, which does not involve allegations of consumer-type fraud; and (2) that the elements of the crime do not apply to the conduct alleged: (a) it is argued that the specific intent, although written in the disjunctive, i.e., "a person is guilty of a scheme to defraud * * * when * * * with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises”, must be read in the conjunctive. This would require, then, in addition to an "intent to defraud” there must also be proof of "fraudulent misrepresentations to the victims,” which it is contended does not exist here; (b) it is argued that the insurance companies were not deprived of any property as a result of the alleged scheme, since the alleged kickbacks were paid by the attorneys out of fees received from the plaintiffs, who were entitled to the settlement monies, or to put it differently, it is contended that no property was obtained because of fraudulent activity;[5] and (c) that there was no "systematic ongoing course of conduct”, rather, it is argued that "if any such scheme existed, it was limited to the settlement of a single case,” on an ad hoc basis.
1. Scheme To Defraud Statute Does Not Contemplate The Conduct Alleged Here
It is claimed that the scheme to defraud statute was intended to "provide prosecutors with a more expedient means of combatting garden-variety consumer frauds than the unwieldy alternative of multiple larceny prosecutions.” Moreover, it is also claimed that the statute "is appropriately viewed and interpreted as an enhanced 'larceny by false pretense’ statute.” The significance of these claims is that it would mean that the conduct alleged here would not fall within the statutory proscription; or if it did, absent a showing, according to this argument, that there had been false statements or false pretenses or promises, and resulting property loss, the charges in the indictment must be dismissed.
This new scheme to defraud crime, as noted by the sponsor, grew "out of the federal mail fraud statute, Title 18 [USC *826 § 1341]” (mem of Assemblyman Fink in support of L 1976, ch 384, 1976 NY Legis Ann, at 316), and was "designed to aid in the prosecution of consumer fraud schemes where many victims are bilked mainly of small amounts of money”. (People v Mikuszewski, 73 NY2d 407, 412 [1989] [referring to the legislative history].) However, while it is correct the Legislature was concerned at that time with protection of consumers, it does not mean that the statute must be construed in such a limited fashion. Indeed, Mikuszewski, the first Court of Appeals decision dealing with the new statute, did so in the context of an alleged scheme to defraud involving a public construction contract, and not a consumer fraud situation.
Moreover, shortly after the statute was enacted, this precise argument was rejected by Beth Israel Med. Ctr. v Smith (576 F Supp 1061 [SD NY 1983 (Lasker, J.)]), a case containing allegations surprisingly similar to those here. Recognizing that the statute was "modelled on the federal mail fraud statute, which clearly encompasses a wide variety of fraudulent practices beyond the area of consumer fraud” (at 1066-1067), Judge Lasker trenchantly stated that "the defendants’ selling and buying of confidential legal information and the use of such information in lawsuits against the unwitting victim of the scheme, and the concealment of the scheme — require no imaginative reading to be characterized as fraud” under the scheme to defraud statute. (Supra, at 1067.) It is evident, therefore, that the scheme to defraud statute is not as circumscribed as urged by the defense. (See also, People v First Meridian Planning Corp., 86 NY2d 608 [1995], supra [statute applicable to fraudulent securities investment scheme involving sales of individualized investment plans]; People v Abedi, 156 Misc 2d 904 [Sup Ct, NY County 1993] [statute applicable to scheme involving State and Federal bank regulators and persons doing banking business].) Clearly, the scheme to defraud statute is not limited.
2. The Elements Of Scheme To Defraud
(a) Either "Intent To Defraud” Or "False Or Fraudulent Pretenses, Representations Or Promises”
The statutory language, on its face, is quite clear. It provides that "[a] person is guilty of a scheme to defraud in the first degree when he * * * engages in a scheme * * * with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises” (Penal Law § 190.65 [1] [b]). It is evident *827 that there are two separate culpable mental states: (1) "intent to defraud more than one person” and (2) "intent * * * to obtain property from more than one person by false or fraudulent pretenses, representations or promises”. In both instances, of course, there is the additional element that the defendant must "so obtain * * * property with a value in excess of one thousand dollars from one or more such persons.” (Penal Law § 190.65 [1] [b].)
It is the defense contention that the two distinct statutory intents, although written in the disjunctive, must be read in such a manner that both intents are "modified by the qualifying phrase 'by false or fraudulent pretenses, representations or promises’.”
This argument begins with language in the Court of Appeals Mikuszewski decision (supra, at 413) that "[t]he scheme to defraud concept borrowed the traditional larceny category of false pretense and false representation, but shifted the focus away from the amount of loss suffered by a particular victim and placed it instead on the nature and extent of the scam.” It continues with People v Kaminsky (127 Misc 2d 497, 503 [Sup Ct, NY County 1985]), where Justice Rothwax, using "ellipses and italics” supposedly indicated that the two types of intent are each modified by the phrase "by false or fraudulent pretenses, representations or promises”. It also relies upon dicta contained in McNally (483 US 350, 358-360, supra), where the Court wrote that although the mail fraud statute refers in the disjunctive to schemes or artifices "to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,” because of congressional and case history, the statutory language should be read so that the words "to defraud” only refer to frauds involving money or property.
I do not read Mikuszewski (supra) as suggested. First, in an earlier passage, the Court concluded that the evidence before the Grand Jury was insufficient because there was lacking "proof that defendants intended to defraud or obtain property by false representations with respect to 10 or more persons within the meaning of the statute.” (Supra, at 412.) This is hardly a statement that each intent should be modified as argued. More significantly, in discussing the requirement that property be obtained from "more than one person” the Court stated, "there was absolutely no evidence that defendants made false representations to other bidding contractors [alleged victims] * * * or that they were in any way defrauded of prop *828 erty rights or interests.” (Supra, at 413; emphasis added.) Clearly, a recognition that, as the statute states, there are two separate specific intents; and each requires that property be obtained as a result of the specified fraudulent conduct. This is not surprising. Fraud is not necessarily the same as false or fraudulent pretenses, representations or promises.
While the scheme to defraud sections do not specifically define these latter terms, the terms "false pretenses” and "false promise” are also contained in title J of the Penal Law (Offenses Involving Theft) (Penal Law § 155.05 [2] [a], [d]). The Penal Law specifically defines "false promise” as "[a] person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property * * * by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct” (Penal Law § 155.05 [2] [d]). "False pretenses” is not statutorily defined, although it has been defined by the Court of Appeals as follows: "false statements about some prior or existing facts.” (People v Norman, 85 NY2d 609, 618 [1995], lv denied 86 NY2d 845 [1995]; People v Churchill, 47 NY2d 151, 155 [1979].) Fraud, of course, is broader than either "false pretenses” or "false promise”. Indeed, it is familiar learning that: "Human ingenuity has clothed fraud in so many guises that it is difficult to give a definition which fraud itself will not find some means of evading. Every kind of artifice employed by one person to deceive another has been defined as fraud.” (60 NY Jur 2d, Fraud and Deceit, § 1, at 429-430 [1987].) It is inconceivable that the Legislature, and there is no hint that it did, intended to cabin "fraud” into the terms "false pretenses” and "false promise”.
Moreover, McNally (supra) is not a holding that the similar language in the Federal mail fraud statute,[6] which is in the disjunctive, should be read in the conjunctive. Rather, the Supreme Court pointed out that the words "to defraud” were designed to reach schemes aimed at depriving others of money or property, and that the 1909 amendment codified its decision in Durland v United States (161 US 306 [1896]) by adding the phrase "false or fraudulent pretenses, representations, or promises,” and "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future *829 as well as other frauds involving money or property.” (483 US 350, 359, supra; emphasis added.) Indeed, the Supreme Court’s very language makes it clear that fraud is separate and distinct from false promises, pretenses and representations. Nowhere in McNally is there any indication that the Court was eliminating the "explicit * * * distinction between mail fraud violations based on schemes 'to defraud’ and those based on schemes 'for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.” (See, United States v Kennedy, 64 F3d 1465, 1476 [10th Cir 1995] [for an enumeration of the traditional elements].) What McNally did is to require, in instances of fraud under the first phrase of the statute, that there must be a deprivation of money or property, and concluded that because traditional definitions of fraud involved property having "tangible” value, the statute did not reach the intangible right to honest and impartial government. (But see, United States v Dinome, 86 F3d 277, 283, n 5 [2d Cir 1996]; Sand, Modern Federal Jury Instructions, at 44-13.)
Finally, People v Kaminsky (supra) does not hold that the disjunctive elements are to be read in the conjunctive; the use of the ellipses which supposedly establishes this is coupled with an italicized "or”, and the statement that the statute "is phrased in the disjunctive,” indicates otherwise.
Therefore, I read the statute as written: requiring either "an intent to defraud more than one person” or the "intent to obtain property from more than one person by false or fraudulent pretenses, representations or”.
(b) Property Having A Value In Excess Of $1,000
The statute requires that "property with a value in excess of one thousand dollars” be obtained from one or more of the victims of the scheme to defraud. (Penal Law § 190.65 [1] [b].) Defendants argue that since the only money obtained from the various insurance companies were legitimate settlement proceeds paid to the attorneys on behalf of the personal injury plaintiffs, the insurance companies were not "deprived of any property by this system.” This is similar to the argument that there was no economic harm to the insurance companies, which argument I rejected for the reasons set forth above. For similar reasons, I conclude that the property obtained from the insurance company equals the amount of the kickback paid by the attorney.
(c) Systematic Ongoing Course Of Conduct
As defined by its terms, a "scheme to defraud”, first or second degree, requires that a person engage "in a scheme constituí *830 ing a systematic ongoing course of conduct”. (Penal Law § 190.60 [1]; § 190.65 [1].) This "language 'refers to a scheme involving more than one isolated act’ ”. (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 190.60, at 424 [1988].) Although only a few cases have dealt with this definition, e.g., Kaminsky (supra, at 501-502), including an instructive one which has not been published (People v Lessof, Sup Ct, Kings County, Dec. 22, 1993, Juviler, J.), the statutory terms are clear and explicit: "systematic” commonly means "having, showing, or involving a system, method or plan” (Random House Dictionary of English Language 1930 [2d ed unabridged 1987]), and "ongoing” commonly means "continuing without termination or interruption” (Id., at 1354). Certainly, on its face, the statute would not apply to episodic or individual acts, unless they are part of a coherent continuing system or plan. While "isolated ad hoc acts” are not cognizable under the scheme to defraud statute, "the details of the separate transactions alleged to comprise parts of the scheme do not have to be identical in every respect, as long as the fact finder is satisfied that there are, among all the transactions, common elements by which each transaction may be identified as having been undertaken pursuant to an over-all fraudulent design.” (People v Kaminsky, supra, at 501-502.) What is essential is that there be "a single, unitary over-all scheme to defraud.” (People v First Meridian Planning Corp., 86 NY2d, supra, at 616.)
Analytically, there is no reason that the People’s theory, if supported by the evidence before the Grand Jury, would not establish a scheme constituting an ongoing course of conduct, involving the particular named defendant.[7] Whether the Grand Jury evidence establishes one ongoing continuous scheme or unitary scheme to defraud involving all of the defendants, except as to the middlemen, is reserved for the decision concerning misjoinder and severance.
[Portions of opinion omitted for purposes of publication.]

. In Carpenter v United States (484 US 19 [1987]), the Court held that McNally (supra) did not limit the mail fraud statute "to tangible as distinguished from intangible property rights”. Thereafter, Congress amended the mail fraud statute to overrule the McNally decision (18 USC § 1346; Pub L 100-690, tit VII, § 7603 [a], eff Nov. 18, 1988).

. In Moll v United States Life Tit. Ins. Co. (710 F Supp 476, 481, n 3 [SD NY 1989]), a civil RICO action, where the plaintiff real estate purchasers’ "sole allegation of economic harm is that they did not receive the title insurance at a lower fee”, Judge Leisure held that New York’s commercial bribery statute, as a matter of law, cannot be violated by a kickback paid to purchase such insurance, because the premium was nonnegotiable. While it may be that for Federal pleading purposes the complaint is deficient absent further allegations (compare, Merrill Lynch, Pierce, Fenner & Smith v Young, 1994 WL 88129 [SD NY, Mar. 15, 1994, Haight, J.]), I do not agree, that as a *820 matter of law, there cannot be economic harm to an employer whose employee accepts kickbacks when a purchase price is fixed.

. That the New York Legislature did not enact corrective legislation following McNally (supra), as did the United States Congress, is of no moment. At the time the scheme to defraud statute was enacted, the Legislature would have understood mail fraud’s pre-McNally meaning and reach. It was in this context that the statute became a part of the Penal Law; there was no need for the Legislature to subsequently deal with the unique new interpretation of McNally.

. Section 190.65 (1) (b) provides: "A person is guilty of a scheme to defraud in the first degree when he * * * engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons.”

. This argument is basically similar to the claim raised under the commercial bribing counts, that there was no economic harm.

. 18 USC § 1341 provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises”.

. It should be recalled that the defendants are not all charged in a single scheme to defraud count; each defendant is individually charged. (Counts 324-365.)