287 F.3d 257
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Thomas RYBICKI, Fredric Grae, Grae, Rybicki & Partners, P.C., Defendants-Appellants-Cross-Appellees.
 Docket No. 00-1044(CON).
 Docket No. 00-1043(L).
 Docket No. 00-1052(XAP).
 Docket No. 00-1055(CON).
 United States Court of Appeals, Second Circuit.
 Argued December 4, 2000.
 Decided April 23, 2002.
 
 COPYRIGHT MATERIAL OMITTED Barry E. Schulman, Law Office of Barry E. Schulman, (Deborah A. Santelmo on the brief), Brooklyn, NY, for Defendant-Appellant-Cross-Appellee Rybicki.
 Ephraim Savitt, New York, NY, for Defendant-Appellant-Cross-Appellee Grae.
 Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP (Erica T. Dubno on the brief), New York, NY, for Defendant-Appellant-Cross-Appellee Grae, Rybicki & Partners, P.C.
 Daniel R. Alonso and Karen R. Sage, Assistant United States Attorneys (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Peter A. Norling and David C. James, Assistant United States Attorneys, on the brief), Brooklyn, NY, for Appellee-Cross-Appellant.
 Before: WALKER, Chief Judge, CABRANES and STRAUB, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Defendants-appellants Thomas Rybicki, Fredric Grae, and the law firm of Grae, Rybicki & Partners, P.C. appeal from the January 27, 2000 judgments of the district court, following a jury trial, convicting them of mail and wire fraud and conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 371, based on their practice of making payments through middlemen or expediters to insurance company adjusters in return for more favorable settlements in personal injury lawsuits.
 
 
 2
 Following an eight-week trial, the jury returned a verdict of guilty against each defendant on twenty counts of mail fraud, in violation of 18 U.S.C. § 1341, two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. Appellants Grae and Rybicki were each sentenced by the district court to terms of imprisonment of one year and one day, three years of supervised release, a $20,000 fine, and a $1,150 special assessment. The district court stayed appellants' surrender pending appeal. Appellant Grae, Rybicki & Partners, P.C. was sentenced to three years' probation, an $80,000 fine, and a $4,600 special assessment.
 
 
 3
 On appeal, appellants raise a host of legal and factual challenges to their convictions. Most of these claims are disposed of by a summary order issued simultaneously with this opinion. We write here only to address appellants' argument that because the government failed to prove that the appellants intended to cause or actually caused economic or pecuniary harm to the victim insurance companies, there was insufficient evidence to establish that their practice of using an intermediary to expedite the settlement of personal injury claims through an insurance company adjuster with whom the intermediary shared his fee constituted a "scheme or artifice to defraud" within the meaning of 18 U.S.C. §§ 1341 and 1346.
 
 
 4
 We hold that in order to convict a defendant based upon a scheme to defraud another of the intangible right of honest services, as contemplated by 18 U.S.C. § 1346, it is unnecessary to prove that the defendant intended economic or pecuniary harm or that any such harm actually resulted from the fraud. All that is required is proof (1) that the defendant engaged in a scheme to defraud; (2) with the intent to deprive another of the intangible right of honest services; (3) that it was reasonably foreseeable to the defendant that the scheme could result in some economic or pecuniary harm to the victim that is more than de minimis; and (4) that the mails or wires were used in furtherance of the scheme. The evidence in this case supported such a finding by the jury, and, therefore, appellants' convictions are affirmed.
 
 BACKGROUND
 
 5
 Because appellants challenge the sufficiency of the evidence to support their convictions, "we review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." United States v. Walker, 191 F.3d 326, 333 (2d Cir.1999) (internal quotation marks omitted). Viewed in this light, the evidence at trial established the following.
 
 
 6
 Appellants are two Staten Island personal injury attorneys and their law firm. In order to obtain favorable results, either as to timing or amount, in settling the personal injury claims of their clients with the opposing insurance companies, appellants would offer a kickback to a middleman or intermediary who would approach the adjuster of the pertinent insurance company and arrange the settlement. It was understood by all concerned that the payments made to the middlemen, generally a percentage of the total settlement amount, would be shared equally between the middlemen and the adjusters. Although each of the insurance companies that employed the adjusters had written policies that prohibited the adjusters from accepting any gifts or fees and required them to report the offer of any gifts or fees, the payments offered to the adjusters were accepted by them but were not reported to their employers. Moreover, the participants of the conspiracy, including Grae and Rybicki, took considerable steps to disguise and conceal the payments made to the middlemen and the adjusters. Appellants were shown to have made payments to adjusters in at least twenty cases that settled for an aggregate of $3,000,000 between 1991 and 1994.
 
 
 7
 At the outset of trial, the government acknowledged that it would not seek to prove that the amount of any of the settlements had been inflated above what would have been a reasonable range for that settlement. It maintained, however, that the settlements were necessarily inflated above the amount that the appellants' clients, personal injury plaintiffs (the "PI Plaintiffs"), would have been willing to accept by at least the amount paid to the middlemen and adjusters, since these amounts did not go to the PI Plaintiffs. The government also established the jurisdictional requisite of use of the mails and wires through evidence of phone calls made by the appellants to implement the settlements, settlement statements mailed by the appellants to the insurance companies, settlement checks (the fruits of the scheme) that the insurance companies mailed to the appellants, several payments that were invoiced and paid by mail, and mandatory filings, adulterated to conceal the payments, that were mailed to the New York State Office of Court Administration ("OCA").
 
 
 8
 The government's proof at trial included testimony from three of the middlemen involved in the scheme, including one who had formerly been an insurance company adjuster and had dealt with Grae in that capacity as well, and an insurance company adjuster who had accepted payments to settle cases involving the Grae & Rybicki firm. Victim insurance company representatives testified that the payments accepted by their adjusters violated internal company policies. The government also introduced wiretap evidence of Grae and Rybicki arranging the settlements of personal injury cases, together with ledgers and records kept by three middlemen that reflected the pay-offs.
 
 DISCUSSION
 
 9
 The mail and wire fraud statutes criminalize the use of the mails and wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341 (mail fraud statute); see also 18 U.S.C. § 1343 (wire fraud statute). Appellants' convictions were grounded on 18 U.S.C. § 1346, which provides as follows:
 
 
 10
 Definition of "scheme or artifice to defraud"
 
 
 11
 For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.
 
 
 12
 Congress enacted this provision in 1988 to expand the definition of "scheme or artifice to defraud" in response to McNally v. United States, in which the Supreme Court held that the mail fraud provision and, by necessary implication, the wire fraud provision were "limited in scope to the protection of property rights." 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); see United States v. Covino, 837 F.2d 65, 71 (2d Cir.1988) (noting that because mail and wire fraud provisions are construed identically, McNally applies to wire fraud as well). In so doing, the Court reversed a conviction involving the deprivation of honest services of a public official on the ground that there had been no allegation that the scheme at issue involved the deprivation of money or property. Id. at 360-61, 107 S.Ct. 2875.
 
 
 13
 Prior to McNally, most circuits had recognized the applicability of § 1341 to frauds involving "intangible rights," including honest services frauds: "In the private sector, purchasing agents, brokers, union leaders, and others with clear fiduciary duties to their employers or unions [were] found guilty of defrauding their employers or unions by accepting kickbacks or selling confidential information." McNally, 483 U.S. at 363, 107 S.Ct. 2875 (Stevens, J., dissenting). Congress enacted § 1346 in response to McNally and reinstated the "intangible rights" doctrine. See United States v. Schwartz, 924 F.2d 410, 416-17 & n. 2, 418-19 (2d Cir.1991) (discussing purpose of § 1346 and its impact on McNally and pre-McNally law); see also United States v. Frost, 125 F.3d 346, 364 (6th Cir.1997) (noting that every circuit to have addressed the question has held that § 1346 overruled McNally).
 
 
 14
 Notwithstanding the passage of § 1346, appellants argue that a conviction for honest services fraud under §§ 1341 and 1343 still requires proof of actual or intended economic or pecuniary harm to the victim — proof, they assert, was lacking in this case. We reject this effort to impose the rule enunciated in McNally on a conviction for honest services fraud. Such a reading would vitiate § 1346 and would contravene Congress's clear intent to bring within the scope of the mail and wire fraud provisions fraudulent conduct that did not have as its object the deprivation of money or property of another.
 
 
 15
 Not surprisingly, no Second Circuit case construing § 1346 supports appellants' argument. Rather, appellants rely almost exclusively on cases that applied the McNally standard to conduct that occurred before the effective date of § 1346. See, e.g., United States v. DiNome, 86 F.3d 277, 283-85 & n. 5 (2d Cir.1996) (applying McNally to pre-§ 1346 conduct, but affirming conviction based on deprivation of information material to victim's economic decisions); United States v. Mittelstaedt, 31 F.3d 1208, 1216-18 (2d Cir.1994) (applying McNally standard to reverse counts based on pre-§ 1346 conduct, but affirming count based on post-§ 1346 conduct); United States v. Miller, 997 F.2d 1010, 1016-20 & n. 5 (2d Cir.1993) (noting that § 1346 is inapplicable to conduct that pre-dated the statute's effective date and applying McNally); Schwartz, 924 F.2d at 416-17 & n. 2, 418-19 (holding that § 1346 does not apply retroactively and applying McNally standard to conduct at issue); Covino, 837 F.2d at 70-71 (reversing conviction for pre-§ 1346 conduct based on McNally).
 
 
 16
 Our § 1346 cases have made clear, however, that the only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services. See United States v. Sancho, 157 F.3d 918, 921 (2d Cir.1998) (per curiam) ("The essential element of a violation of § 1343, incorporating § 1346, is a scheme to deprive another of the `intangible right of honest services.'"); see also Walker, 191 F.3d at 335 (noting that element of specific intent to harm required by § 1341 can be satisfied by proof that defendant's mail fraud scheme was intended "to deprive its victims of `the intangible right of honest services'"); United States v. Altman, 48 F.3d 96, 101 (2d Cir.1995) (purpose of mail fraud scheme must be either obtaining money or property or depriving another of the right of honest services).
 
 
 17
 Appellants also argue that even if an intent to cause economic harm is not a required element of an honest services fraud, some economic harm must, in any event, result from the fraud. They point to the government's alleged concession that all of the personal injury claims here were settled for fair value to argue that no actual harm occurred in this case. This reading of § 1341 does not even conform to the rule announced in McNally: it was well-settled law both before and after McNally that the government does not have to establish that a scheme to defraud was successful or resulted in any actual harm to the victim. See Walker, 191 F.3d at 335; DiNome, 86 F.3d at 283; United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir.1994) (citing Durland v. United States, 161 U.S. 306, 315, 16 S.Ct. 508, 40 L.Ed. 709 (1896)); Mittelstaedt, 31 F.3d at 1216 (citing United States v. Wallach, 935 F.2d 445, 461 (2d Cir.1991)); United States v. Starr, 816 F.2d 94, 98 (2d Cir.1987). Rather, the only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm. See United States v. Guadagna, 183 F.3d 122, 130 (2d Cir.1999) ("`[W]hen the "necessary result" of the... scheme is to injure others, fraudulent intent may be inferred from the scheme itself.'") (quoting D'Amato, 39 F.3d at 1257) (second alteration in original); see also United States v. McDonough, 56 F.3d 381, 391 (2d Cir.1995).
 
 
 18
 In short, we hold that, in proving "a scheme or artifice to deprive another of the intangible right of honest services" as the object of mail or wire fraud, the government need not prove either that the defendant intended to cause the victim economic or pecuniary harm or that such harm actually resulted from the scheme to defraud.[1]
 
 
 19
 Appellants next argue that § 1346's expansion of the definition of a "scheme or artifice to defraud" to include a scheme or artifice to deprive another of "the intangible right of honest services" is unconstitutionally vague. Where there is a vagueness challenge to a statute that does not involve First Amendment freedoms, the statute must be evaluated on an "as applied" basis. See, e.g., United States v. Whittaker, 999 F.2d 38, 42 (2d Cir.1993). Such a criminal statute is not impermissibly vague if it provides explicit standards for those who apply it and gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. See, e.g., United States v. Schneiderman, 968 F.2d 1564, 1568 (2d Cir.1992), abrogated on other grounds, Posters `N' Things v. United States, 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994); see also United States v. Bohonus, 628 F.2d 1167, 1173 (9th Cir.1980) ("To withstand a vagueness challenge, a criminal statute must be reasonably specific."). In addition, a statute's requirement that a specific intent be proven may prevent even a broadly framed standard of conduct from being held to be impermissibly vague. See, e.g., United States v. Margiotta, 688 F.2d 108, 129 (2d Cir.1982); Bohonus, 628 F.2d at 1174-75.
 
 
 20
 Vagueness challenges to the application of § 1346 and honest services fraud to similar conduct have been rejected by this and other circuits. See, e.g., United States v. Frega, 179 F.3d 793, 798, 803 (9th Cir. 1999) (rejecting vagueness challenge by an attorney convicted under § 1346 for bribing state court judge); Frost, 125 F.3d at 352, 370-71 (same in the context of university professor who helped students to obtain degrees by fraud in exchange for their influence in obtaining government contracts); United States v. Gray, 96 F.3d 769, 772, 776-77 (5th Cir.1996) (same in the context of basketball coaches who helped students obtain academic eligibility by fraud); United States v. Castro, 89 F.3d 1443, 1447-48, 1455 (11th Cir.1996) (same in the context of attorneys who paid kickbacks to state court judges to obtain appointments as public defenders); United States v. Bryan, 58 F.3d 933, 937-38, 941-43 (4th Cir.1995) (same in the context of lottery director who abused his position to manipulate award of advertising contract), abrogated on other grounds, United States v. O'Hagan, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); see also Margiotta, 688 F.2d at 112, 129 (rejecting vagueness challenge to honest services prosecution under § 1341 for abuse of political position by distributing insurance commissions to political associates); Bohonus, 628 F.2d at 1167, 1172-75 (same in context of abusing managerial authority over contract to extort kickbacks).
 
 
 21
 A panel of this court, however, recently upheld a vagueness challenge to § 1346 in the context of a bid contractor working for a state school authority who wilfully breached a contract requirement that he pay the prevailing wage to his employees. See United States v. Handakas, 286 F.3d 92, 2002 WL 449536, at *1-*2 (2d Cir. Mar.22, 2002). After reviewing the language and history of § 1346, the panel concluded that the phrase "honest services" was too vague to give notice to a person of ordinary intelligence that a "breach of contract could subject one to a mail fraud conviction." Id. at *13.
 
 
 22
 While we agree fully with the Handakas panel's observations concerning the vagueness of the phrase "honest services," see id. at *7-*17, Handakas does not aid appellants in this case. As Handakas itself observed, we are bound by this court's precedents upholding convictions under § 1346 that involved schemes, like the one at issue here, in which the defendant breached or induced the breach of a duty owed by an employee or agent to his employer or principal that was enforceable by an action at tort. See id. at *12. For example, in Sancho we affirmed the conviction of a real estate developer who, in seeking to obtain a multi-million dollar letter of credit from a construction company to secure a construction loan, agreed to bribe the person he believed to be the company's financial consultant to induce the consultant not to disclose to the company that the letter of credit would be invested in a sham financing program. See Sancho, 157 F.3d at 919. In United States v. Middlemiss we affirmed a § 1346 conviction in which a New York Port Authority employee used his position to obtain a cafeteria lease for a company in which he had an undisclosed financial interest. See 217 F.3d 112, 120 (2d Cir. 2000).
 
 
 23
 In light of Sancho and Middlemiss, we see no basis for finding § 1346 vague as applied to this case given that appellants are sophisticated attorneys who were presumptively aware that their payments to insurance adjusters to expedite claims created improper conflicts of interest for the adjusters with respect to their employers. In addition, appellants' efforts to avoid detection, such as omitting required information on OCA filings and failing to record the bribes in any of their financial documentation, are indicative of consciousness of guilt, see, e.g., Bryan, 58 F.3d at 942-43; United States v. McDonough, 56 F.3d 381, 391 (2d Cir.1995), thereby negating appellants' claim that they had no notice their conduct was illegal.
 
 
 24
 While we do not find that § 1346, as applied in this case, is unconstitutionally vague, we agree with appellants that because the statute does not define honest services, the potential reach of § 1346 is virtually limitless. See Frost, 125 F.3d at 368-69 (discussing potential breadth of statute and "need to avoid the over-criminalization of private relationships"). As we have noted, "not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud." United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir.1986), aff'd, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); see also United States v. Sun-Diamond Growers, 138 F.3d 961, 973 (D.C.Cir.1998) (making same observation with respect to violations of § 1346). For example, a customer who importunes an employee to allow her to use the company's telephone access code to make an important long-distance telephone call, in the face of a written company policy expressly prohibiting non-employees from using the access code, could conceivably fall within the scope of the statute if read literally. So too could an employee's use of his company's letterhead to lend authority to a letter of complaint mailed to the employee's landlord in disregard of the company's code of conduct prohibiting the use of the company's letterhead for non-company business.
 
 
 25
 Several circuits, addressing this concern, have interpreted "scheme or artifice to deprive another of the intangible right of honest services" in such a way as to properly curtail the statute's reach. See, e.g., id. (recognizing "the risk that federal criminal liability could metastasize" if § 1346 were read too broadly); Frost, 125 F.3d at 365-69 (noting breadth of literal terms of § 1346 and discussing various approaches to defining reach of statute); United States v. Cochran, 109 F.3d 660, 667 (10th Cir.1997) (observing that "it would give [the court] great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing"); United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir. 1997) (noting that Congress did not enact § 1346 "to create what amounts to a draconian personnel regulation"); United States v. Jain, 93 F.3d 436, 441-42 (8th Cir.1996) (discussing problems with extending "honest services" doctrine to private sector); cf. United States v. Sawyer, 85 F.3d 713, 728 (1st Cir.1996) (holding, in context of misconduct by state government employees, that "[t]o allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced").
 
 
 26
 Some courts have imposed a requirement that the misrepresentation or omission at issue be "material," such that "an employee has reason to believe the information would lead a reasonable employer to change its business conduct." Gray, 96 F.3d at 775 (internal quotation marks omitted); see also Cochran, 109 F.3d at 667 (requiring a showing of materiality); Jain, 93 F.3d at 441-42 (same). The First Circuit has at times adopted a requirement that the deprivation of honest services must either result in some articulable harm to the victim or be intended for some gainful, though not necessarily economic, use to the defendant. See United States v. Jordan, 112 F.3d 14, 19 (1st Cir.1997); Czubinski, 106 F.3d at 1077 (reversing conviction based on defendant's unauthorized accessing of confidential tax records where there was no showing that defendant intended to disclose or otherwise use the confidential information for personal gain). Finally, several circuits have adopted a requirement that it must have been reasonably foreseeable to the defendant that the scheme at issue could have resulted in some economic or pecuniary harm to the victim. See United States v. Vinyard, 266 F.3d 320, 328-29 (4th Cir. 2001), petition for cert. filed, 70 U.S.L.W. 3535 (U.S. Jan. 8, 2002) (No. 01-1186); United States v. Martin, 228 F.3d 1, 17 (1st Cir.2000); United States v. deVegter, 198 F.3d 1324, 1329-30 (11th Cir.1999); Sun-Diamond, 138 F.3d at 973-74; Frost, 125 F.3d at 368.
 
 
 27
 While we see merit in each of the approaches taken by the different circuits, we believe the "reasonably foreseeable harm" standard to be superior because, in contrast to the other tests, it focuses the inquiry on whether the scheme at issue created a foreseeable risk of economic or pecuniary harm to the victim, which is consistent with traditional notions of fraud and fraudulent harm. See McNally, 483 U.S. at 358, 107 S.Ct. 2875 (observing that "the words `to defraud' ... `usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'"). In addition, the "reasonably foreseeable harm" test has the virtue of being capable of straightforward and consistent application, while at the same time placing a reasonable boundary around what is otherwise so boundless a concept as to be a suitable candidate for a finding of unconstitutional vagueness, see Handakas, 286 F.3d 92, 2002 WL 449536, at *7-*17. We hasten to add, however, that the foreseeable economic or pecuniary harm must be more than de minimis, in order to establish a minimum threshold that will exclude cases, such as the two hypothetical ones discussed above, that could result in some slight economic harm — such as the cost of stationery or a single phone call.
 
 
 28
 The standard we announce today clearly encompasses the economic risks that have been recognized by other circuits, such as the economic risks created by inducing an employee to disclose confidential trade secrets to a competitor, see, e.g., Martin, 228 F.3d at 17-18; paying an employee or agent to violate his or her duty to obtain the most advantageous contracts or recommend the most qualified independent contractors on behalf of his or her employer or principal, see, e.g., deVegter, 198 F.3d at 1326, 1331; United States v. Pennington, 168 F.3d 1060, 1064-65 (8th Cir.1999); and soliciting illegal or unethical conduct by an employee that endangers his employer's public reputation, see, e.g., Sun-Diamond, 138 F.3d at 973-74; Frost, 125 F.3d at 367-68.
 
 
 29
 This prudential limitation on the reach of § 1346 is consistent with our previous decisions upholding convictions under § 1346. For example, in Sancho, 157 F.3d at 919, we affirmed the conviction of a real estate developer who, in seeking to obtain a multi-million dollar letter of credit from a construction company to secure a construction loan, agreed to bribe the person he believed to be the company's financial consultant to induce the consultant not to disclose to the company that the letter of credit would be invested in a sham financing program. On these facts, it was reasonably foreseeable to Sancho that if his scheme were successful, it could cause economic harm to the company by putting its letter of credit at risk and by exposing it to potential liability for the construction loan. Similarly, in Middlemiss, 217 F.3d at 120, in which a New York Port Authority employee used his position to obtain a cafeteria lease for a company in which he had an undisclosed financial interest, it was reasonably foreseeable that the Port Authority could suffer economic harm as a result of being deprived of the opportunity to obtain a more favorable lease or to grant the lease to a superior food service company.
 
 
 30
 Accordingly, we hold that the elements necessary to establish the offense of honest services fraud pursuant to 18 U.S.C. § 1346 are: (1) a scheme or artifice to defraud; (2) for the purpose of depriving another of the intangible right of honest services; (3) where it is reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the victim that is more than de minimis; and (4) use of the mails or wires in furtherance of the scheme.
 
 
 31
 Applying this standard to the case at hand, we find it to have been fully satisfied in light of the evidence presented at trial and the instructions given to the jury. We will affirm a jury verdict if any rational jury "could have found the essential elements of the crime beyond a reasonable doubt." See Walker, 191 F.3d at 333 (internal quotation marks omitted).
 
 
 32
 The district court properly instructed the jury that in order to convict the appellants, they had to find that it was "reasonably foreseeable [to the appellants] that the companies in question might suffer economic harm as a result of the breach of the employee's duty."
 
 
 33
 Based on the evidence presented at trial, the jury could have reasonably concluded that appellants, in offering a percentage of the settlement as a kickback to the insurance company adjusters, intended to obtain favorable treatment from the adjusters at the expense of the insurance companies' intangible right to the adjusters' undivided loyalty and honest services. In addition, the jury could have found that it was reasonably foreseeable to the appellants that the effect of the payments made to the adjusters would have been to provide an incentive to the adjusters to not seek the lowest settlement amount or to not delay the settlement, thereby depriving the insurance companies of the difference between the most favorable settlement the adjusters could have otherwise obtained and the settlement actually agreed upon or the time value of money lost by expediting the settlement and disrupting the normal patterns of case disposition.
 
 
 34
 We reject appellants' efforts to define the deception at hand as a failure by the adjusters to report gratuities to their employers and to argue that this deception was immaterial to the settlement of the personal injury suits.
 
 
 35
 We are also unpersuaded by appellants' uncontested assertions that the insurance claims were settled within a reasonable range and that they intended no economic harm. First of all, even if these assertions are true, appellants' argument conflates the concepts of actual and intended harm with reasonably foreseeable harm. See, e.g., Vinyard, 266 F.3d at 329-30 (rejecting similar argument on ground that "[t]he reasonably foreseeable harm test [requires] neither ... an actual economic loss nor an intent to economically harm the employer," thus regardless of whether transaction was "objectively fair," employer was deprived of opportunity to search for best price). Moreover, the jury could reasonably have inferred that the PI Plaintiffs would have been willing to accept a settlement that did not include the cost of the payments to the adjusters and, therefore, that each of the settlements was necessarily inflated by the amount of the payment. From this, it is no great leap to conclude that the payments made to the adjusters came out of their employers' respective pockets. We note that this was the same conclusion reached in the insightful and thorough opinion by the state trial court that tried and convicted other defendants who were involved in the same scheme. See People v. Reynolds, 174 Misc.2d 812, 667 N.Y.S.2d 591, 595-96 (N.Y.Sup.Ct.1997) (Fried, J.) (finding that kickback constituted economic harm to the employers, who were deprived of the opportunity of possibly settling for less). In light of the foregoing evidence and the instructions to the jury, we conclude that appellants' convictions were supported by sufficient evidence.
 
 
 36
 To recap, we hold that to convict a defendant of mail or wire fraud where the purpose of the scheme is to deprive another of the intangible right of honest services, as defined by 18 U.S.C. § 1346, the government does not have to prove actual or intended economic or pecuniary harm, but it does have to prove that it was reasonably foreseeable that the fraudulent scheme could result in some economic consequence that was more than de minimis. Because this requirement was satisfied in the instant case, we affirm the judgments of the district court convicting appellants of mail and wire fraud, and conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 371, 1341, and 1343.
 
 CONCLUSION
 
 37
 The judgments of conviction are affirmed.
 
 
 
 Notes:
 
 
 [1]
 We do not rule out the possibility that the government in this case could have established actual or intended economic or pecuniary harm had it been required to do so