[702 NYS2d 119]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN C. BRIGHAM, Appellant.

Third Department, December 23, 1999

44

APPEARANCES OF COUNSEL

*O'Connell & Aronowitz,* Albany (*Cornelius D. Murray* of counsel), for appellant.

*Eliot Spitzer, Attorney General,* New York City (*Donald H. Zuckerman* of counsel), for respondent.

**OPINION OF THE COURT**

SPAIN, J.

After a nonjury trial defendant was convicted as charged of one count of scheme to defraud in the first degree (Penal Law § 190.65 [1] [b]), a felony, and two misdemeanor counts of failure to file corporate tax returns (Tax Law § 1801 [b]). The charges stem from the allegations that defendant, a physician, systematically overstated fees for medical services to insurance companies, and failed to file corporate franchise tax returns and pay the corporate taxes for 1994 and 1995 for his medical services corporation, American Medical Services, P. C. (hereinafter AMS), which he incorporated in 1989. He was sentenced to determinate sentences of 120 days of imprisonment plus $4^2/_3$ years of probation for the scheme to defraud conviction, and to 60 and 120 days of imprisonment respectively for the failure to file corporate tax return convictions, all terms of imprisonment to be served concurrently. In addition, after a hearing, Supreme Court ordered defendant to pay restitution in the amount of $21,781.89 to the insurance companies and $8,188.95 to the Department of Taxation and Finance. Defendant now appeals challenging the judgment of conviction, the sentences and the order of restitution.

Initially, addressing the misdemeanor counts, Supreme Court properly concluded that defendant was subject to individual criminal liability under the Tax Law as the officer, employee or agent of a dissolved corporation (*see,* Tax Law § 1801 [b]; § 209 [1]). Tax Law § 1800 (a) states that the term " 'person,' " as used in Tax Law article 37, includes a "corporation (including a dissolved corporation)." Tax Law § 1800 (b), without making specific reference to dissolved corporations, states that "the term 'person' shall *also* include an officer, employee or agent of a corporation" (emphasis supplied). Reading these provisions together, the term "corporation" as used in Tax Law § 1800 (b) includes a dissolved corporation. A contrary reading of Tax Law § 1800 (b) so as not to include dissolved corporations would defeat the purpose of the statute, which was enacted to impose criminal sanctions on persons and entities guilty of tax evasion. It would also allow officers of dissolved corporations which are explicitly subject to tax liability to escape punishment by the mere fact that the corporation was dissolved when the failure to file occurred. Such a

contrary construction would render the statute ineffective (see, McKinney's Cons Laws of NY, Book 1, Statutes § 144) and would be absurd (see, McKinney's Cons Laws of NY, Book 1, Statutes § 145). Accordingly, we conclude that the criminal liability imposed on a "person" by Tax Law article 37 (see, Tax Law § 1801 [b]) applies to dissolved corporations as well as to the officers, employees and agents of dissolved corporations.

The fact that defendant, as sole shareholder, officer and director of AMS, continued to control and to conduct business operations under the corporate name in 1994 and 1995—even after the corporation was dissolved—provides proof beyond a reasonable doubt that defendant was responsible for the corporation's failure to timely file corporate franchise tax returns for 1994 and 1995. Such conduct also supports the inference that he intended to evade the taxes owed for those years. Given the fact that defendant continued to operate AMS as its sole shareholder, officer and director after its 1993 dissolution and that he claimed that he did not know until the fall of 1995 that AMS had been dissolved, defendant's argument that he did not realize the 1994 corporate tax return was not filed and taxes were not paid in 1995 is not credible (see, Tax Law § 197-b [1] [a]; § 209 [1]). Likewise, although defendant eventually became aware in the fall of 1995 that AMS had been dissolved, the corporation conducted business operations in 1995 and, therefore, it cannot be concluded that defendant did not know that he needed to file a 1995 corporate tax return and pay whatever taxes were due (see, Tax Law § 209 [1], [3]; § 197-b [1] [a]).

■ We also reject defendant's assertion that it was improper for Supreme Court to order, as restitution, that defendant himself pay the corporate taxes for the years 1994 and 1995. Defendant, as sole shareholder, director and officer, exercised complete dominion and control over the corporation. He had the authority as well as the responsibility to file the corporation's tax returns. Additionally, he was entitled to and had full access to the net profits of the business, if any, and may be held liable for its debts (see, Austin Powder Co. v McCullough, 216 AD2d 825, 826). In our view, as the "alter ego" of the corporation (see, id.), defendant profited from his failure to timely file the corporate tax returns and to pay the taxes thereon (see, Tax Law § 197-b [1] [a]; § 209 [1]). Thus, restitution of the loss to the victim—in this case the taxing authority—was appropriate (see, Penal Law § 60.27 [1], [2], [4] [b]).

■ However, we find merit in the assertion that the People failed to prove beyond a reasonable doubt that defendant

engaged in a scheme to defraud. The indictment charges that defendant engaged in a scheme to defraud in that he "submitted and caused to be submitted to various insurance companies claim forms which systematically overstated the charges for medical services rendered to insured patients * * * [and] thereby obtained in excess of $1,000 in *overcharges from* several of those *insurance companies*" (emphasis supplied). The People's bill of particulars specifies, *inter alia*, that the conduct which constituted the scheme to defraud was that defendant "created and caused to be created a Fee Schedule to be used and in fact was used by his employees to charge patients" and that "he created and caused to be created a separate and different list of charges * * * that he caused to be used to bill insurance companies [and] thereby significantly overstated and caused to be *overstated to the insurance companies* the charges to the insured patients for the services * * * they received" (emphasis supplied).

The People's proof established that defendant offered his patients a discounted fee system in which he charged a "cash-reduced fee" to all patients who were uninsured or who chose to forego their insurance and pay cash for services rendered. The cash-reduced fee schedule, in most instances, conferred upon cash-paying patients a discount of 67% to 75% from the usual and customary charges paid by insurance companies for the same services. For patients who chose to utilize their health insurance coverage, if the insurance company would not pay defendant directly, defendant declined to deal with the insurance company and the patient was responsible for paying the cash-reduced fee. These patients could then independently seek reimbursement from their insurers for a portion of that cash-reduced fee.

If the insurance company would pay defendant directly, his office personnel ascertained from the insurance company the amount of the patient's unmet deductible, if any, and the percentage of the patient's copay responsibility, which was usually 20%. Insured patients were then required to pay defendant up front a "deposit" comprised of (1) their unmet deductible, if any, and (2) a discounted copay which defendant calculated by applying their copay percentage to his cash-reduced fees for the services provided. The claim forms submitted by defendant to the insurance companies reflected defendant's nondiscounted charges to insurance companies for the services provided. For example, if defendant submitted a claim to an insurance company for $1,205 for a first trimester abortion, the patient

would be required to pay him a "deposit" made up of the balance of the unmet deductible, if any, plus a discounted copay of 20% of the cash-reduced fee for that service. Defendant's non-discounted charges submitted to insurance companies were somewhat higher than the fees insurance companies recognized as "usual and customary" and which they paid for the services provided, but were significantly higher than defendant's discounted cash-reduced fees. One net result of defendant's billing practice is that a patient's copay for a claim was calculated using the cash-reduced fee schedule while the insurance company was billed in a submitted claim based upon defendant's nondiscounted fee schedule. The People and Supreme Court in its verdict focused on this practice as the key factor in defendant's alleged scheme to defraud.

We agree with Supreme Court's conclusion that there is insufficient evidence in the record to support the conclusion that defendant billed insurance companies for services not actually performed. Further, the insurance companies— regardless of how high defendant stated his charges on the claim form submitted—determined and set their own payment rates for each procedure or service *based upon what they considered to be the usual and customary rate for that particular procedure or service* in the geographic area where the service was provided, and paid that rate to defendant as long as the insurance company was satisfied that the procedure was actually performed after, *inter alia*, reviewing the patient's file. Thus, the insurance companies did not pay defendant based on the charges he submitted for the specific services rendered, and the fact that defendant's nondiscounted charges to insurers were usually higher than the insurers' usual and customary rates for each particular service or procedure had no bearing on what the companies paid. Notably, defendant accurately reported the "amount paid," if any, by the patient on the submitted insurance claim form and this amount was also not a factor in any insurance company's payment of its established rate to defendant. Rather, the insurance companies determined their usual and customary rates for the services reflected in the claims submitted, deducted therefrom the patient's copay percentage and unmet deductible, if any, and paid the balance to defendant.

Based upon the foregoing, Supreme Court found[1] that, although it did not appear to be illegal to charge a cash-reduced fee to patients and charge a higher fee to insurance companies, where a patient's copay was calculated based upon the lower cash-reduced fee schedule—but the insurance company, on the other hand, was charged according to defendant's higher, non-discounted rate schedule—defendant's billing practices "constituted a misrepresentation" to the insurance companies. The court concluded that defendant's utilization of different fee schedules was a misrepresentation to the insurance companies of the *actual* cost of the services and, therefore, defendant fraudulently obtained payments in excess of the actual cost— i.e., the cash-reduced fee—of the services provided to that particular patient.[2] Significantly, however, Supreme Court found that where a claim form reflected that an insured paid no deductible or copayment to defendant, defendant had not engaged in a scheme to defraud.

In our view, Supreme Court's finding that defendant's billing practices constituted a misrepresentation in violation of Penal Law § 190.65 (1) (b) is not supported by legally sufficient record evidence. In reviewing legal sufficiency, an appellate court is required "to view the evidence in the light most favorable to the prosecution and decide whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt" (*People v Harper*, 75 NY2d 313, 316; *see, People v Contes*, 60 NY2d 620, 621). Penal Law § 190.65 (1) (b) provides that: "A person is guilty of a scheme to defraud in the first degree when he * * * engages in a scheme constituting a systematic ongoing course of conduct with *intent to defraud* more than one person or *to obtain property* from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons" (emphasis supplied).

---

1.   Supreme Court's findings and conclusions are set forth in the record in its verdict, which was rendered at the close of the trial, and are elaborated upon more fully in the court's written decision, which was rendered after the restitution hearing.

2.   In arriving at this conclusion Supreme Court determined that "[t]he medical insurance companies are obligated to pay for the actual cost of the medical procedure performed, or the usual and customary fee charged therefore, whichever is less." In that regard, insurance company representatives testified at trial that their obligations were limited to their established usual and customary rates but in no event were they obligated to pay more than the amount the patient was obligated to pay.

To perpetrate a scheme to defraud, the statute requires either an "intent to defraud more than one person" or an "intent * * * to obtain property from more than one person by false or fraudulent pretenses, representations or promises" (Penal Law § 190.65 [1] [b]; see, People v Reynolds, 174 Misc 2d 812, 826-829; see also, People v Mikuszewski, 73 NY2d 407, 412-413). "The scheme to defraud concept borrowed the traditional larceny category of false pretense and false representation, but shifted the focus away from the amount of the loss suffered * * * and placed it instead on the nature and extent of the scam" (People v Mikuszewski, supra, at 413). "[T]he essence of the crime * * * is the nefarious character of the scheme" (People v Palmer, 108 AD2d 545, 546).

According to the indictment and the bill of particulars, the People alleged that defendant violated Penal Law § 190.65 (1) (b) by intentionally obtaining property from the insurance companies by false and fraudulent pretenses and representations. The term "false pretenses" has been defined by the Court of Appeals as "false statements about some *prior or existing facts*" (People v Norman, 85 NY2d 609, 618 [emphasis in original]) and, thus, contemplates a misrepresentation or an untrue statement of fact or facts. Supreme Court specifically found in its verdict that defendant's billing practices "constitute a misrepresentation as to a past or present material fact to the insurance company [thus] constitut[ing] a Scheme to Defraud".

The People have asserted from the outset that defendant fraudulently misrepresented to the insurance companies the *actual fees* he charged those of his patients who chose to utilize their insurance coverage. The People's entire theory relies on the erroneous supposition that the discounted cash-reduced rates upon which these patients' copays were based became fixed as the only rates defendant could charge the insurance companies, each of which had already established its usual and customary rate for each particular medical procedure or service. Significantly, the fact that defendant conferred a discount on his patients did not compel defendant to confer a comparable discount on the insurance companies. The untenable premise inherent in this prosecution is that the insurance companies were entitled to discounted pricing merely because defendant afforded his uninsured or voluntarily uninsured patients such a discount, and because he based the insured patients' copays on this discounted rate schedule. In our view, neither defendant's practice of basing copays on a discounted

cash-reduced fee scheduled, nor his conduct in charging that fee schedule to uninsured patients or patients electing not to submit claims for insurance coverage, constituted a *waiver* of defendant's entitlement to charge insurance companies his nondiscounted rate. Thus, defendant's practice in *openly* charging these higher, nondiscounted rates to insurance companies did not constitute a misrepresentation of his actual charges for services rendered or an "overcharge" for services rendered.

Importantly, there is no proof in the record to support the conclusion that defendant benefitted financially from this practice of offering patient discounts. Rather, the uncontroverted proof is that defendant received substantially *less* than he was entitled to receive from his uninsured or voluntarily uninsured patients—because they paid only the highly discounted cash-reduced fee; he also received *less* than full copays from his insured patients because he based their copays on the cash-reduced fees. Indisputably, the insurance companies paid defendant no more than their copay percentage share of what they determined to be the usual and customary rate for defendant's services minus any unmet deductible; the amount of a patient's copay (which a provider must obtain directly from the patient) had no effect whatsoever on the amount paid to defendant by the insurance companies. Thus, defendant did not obtain property or money from the insurers (or the patients) to which he was not entitled or which was not earned for actual services provided.

Furthermore, the assertion that the insurance companies were deceived is negated by the fact that with each insurance claim filed, defendant's office—as required—submitted each patient's complete medical file which contained information putting the insurance companies on notice of defendant's billing practices. For example, the patient files each contained a form signed by the patient and entitled "Signature on File" authorizing defendant's office to release all information to the insurance company and which, *inter alia,* contains the following statement: "I understand that my insurance company will be billed a private profile fee with *[sic]* is greater than the cash-reduced fee." The patients files also contained a copy of an "Insurance Verification Form" used by defendant's employees to verify coverage and calculate the deposit, if any, charged to the patients; this form included a figure representing any unmet deductible plus a figure indicating the copayment percentage (usually 20%) *of the cash-reduced fee,* and both figures were openly entered on this form thereby revealing the formula

used to calculate the patient's deposit. This information gave notice to the insurance companies that defendant was billing the companies at his nondiscounted rates, and also gave them sufficient information to calculate the discounted fee upon which the copayments were based.[3]

Moreover, there is no evidence that the insurance claim forms,[4] or the instructions or guidelines which relate to those forms, contained any information which put defendant (or his employees) on notice that the insurance companies expected the benefit of any discount conferred upon the patient, or that a patient's copay must be based upon defendant's charges to the insurance companies. Furthermore, the People have not relied upon or cited any regulations, statutes or decisional law applicable to the facts in this case which would require a provider under these circumstances to inform an insurance company of any discount or reduction in the fees charged to the patient.

Accordingly, upon our review of the evidence in the light most favorable to the prosecution, and affording the People all permissible inferences to be derived therefrom, it is clear that the finding of guilt as to the charge of scheme to defraud was not based upon legally sufficient evidence (see, People v Bleakley, 69 NY2d 490, 495) and a reversal of that conviction and the sentence imposed thereon is warranted. Inasmuch as we are reversing the scheme to defraud conviction, the part of the order of restitution which directs that defendant make certain payments to insurance companies is necessarily reversed and vacated (see, Penal Law § 60.27 [1]).

Our analysis of the additional issues raised by defendant with respect to the scheme to defraud charge is unnecessary. Defendant's remaining contentions, including selective prosecution and the harshness of the sentence, have been considered

---

**3.** Additionally, there is testimony in the record from defendant's office manager that there were instances where insured patients who initially chose to pay the cash-reduced fee thereafter submitted a claim to their insurance carrier for reimbursement of that fee to themselves. Thus, such claims for reimbursement of the cash-reduced fee as reflected in the receipted bill would give the insurance company notice of the existence and amount of the cash-reduced fee.

**4.** While the claim form contains a box for the "total charge" for the services set forth on the form, and a box indicating the "amount paid by the patient," the insurance company—aware of the patient's unmet deductible— could easily calculate whether or not defendant was charging up-front copays representing the full 20% of the insurance company's usual and customary charges.

and found to be either unpreserved for our review or lacking in merit.

MERCURE, J. P., CREW III and GRAFFEO, JJ., concur.

PETERS, J. (concurring in part and dissenting in part). I agree with the majority's dismissal of the charge of scheme to defraud and that such determination warrants the reversal of that part of the order of restitution which directs defendant to make certain payments to insurance companies. We part company, however, on the discretionary issue of remand.

Upon our modification of the judgment, there remains a conviction on two misdemeanor counts of a failure to file corporate tax returns. Supreme Court, having sentenced defendant upon his felony conviction to 120 days of imprisonment plus four years and eight months of probation, proceeded to sentence him to 60 days in jail for his first failure to file and 120 days for his second, to be served concurrently with the felony sentence. While the majority believes that it is appropriate to simply reduce the sentence imposed by the amount designated for the felony conviction, I "cannot say that the court was not influenced by the fact it had just sentenced defendant for the crime of [scheme to defraud in the first degree]" (*People v Lopez*, 58 AD2d 516, 517; *see, People v Jackson*, 140 AD2d 458, 459-460, *lv denied* 72 NY2d 919). For this reason, I would vacate the sentence imposed by Supreme Court and remit for resentencing on the remaining counts (*see*, CPL 470.20 [3]).

Ordered that the judgment is modified, on the law, by reversing so much thereof as found defendant guilty of the crime of scheme to defraud in the first degree as well as that part of the order of restitution related thereto; said count of the indictment is dismissed and matter remitted to the Supreme Court for further proceedings pursuant to CPL 460.50 (5); and, as so modified, affirmed.