OPINION OF THE COURT
Titone, J.
In each of these cases, the defendants were convicted of larceny after selling goods to customers, taking the customers’ money and then failing to deliver the promised goods. Their appeals from the judgments of conviction require us to revisit the specialized requirements for the crimes that were known as larceny by false promise and larceny by false pretenses before the adoption of the Penal Law.
*613 I.

People v Norman

In 1989, according to the trial evidence, defendant entered into a one-year lease on an old sawmill in South Colton, New York, opened a business office in the City of Watertown and began selling kits to individuals wishing to build their own log homes. In June of 1990, Joseph and Sharon Gana, responding to a newspaper advertisement, contacted defendant and expressed an interest in purchasing one of his log home kits. During their discussions, defendant offered the Ganas the opportunity to become dealers for his product. As dealers, the Ganas would be responsible for allowing prospective customers to see their own log home and would receive a 15% commission on any home they sold or on any sale defendant made as a result of their referral.
On July 19, 1990, the Ganas signed a contract to purchase a log home kit for $20,325. The delivery date was left open because the Ganas needed to dig a foundation before they would be ready to receive their logs. Payment was to be made upon delivery, which, according to defendant, would occur within two weeks of the Ganas’ request.
Approximately three weeks after the Ganas signed their contract, defendant called them and stated that he had another couple from their area, the Mikels, who were interested in a dealership. Defendant was prepared to give the Ganas’ dealership to this couple unless the Ganas paid for the log home kit by August 9th. According to Sharon Gana, defendant was quite insistent on that date. Anxious not to lose their dealership opportunity, the Ganas obtained a loan and wired defendant the full amount of the purchase price on August 8, 1990. No arrangements for delivery were made at that time, since the Ganas’ foundation was still not ready.
In mid-September of 1990, the Ganas told defendant that they were ready for their kit, but, despite defendant’s promise to deliver at least part of the material, several weeks passed without a delivery. In the ensuing weeks, defendant offered the Ganas a series of excuses for his failure to deliver, including problems with truckers, problems with the mill, a death in the family, a need for new equipment and a claim that the logs milled for the Ganas had turned black. In the end, the Ganas travelled to defendant’s office, arriving just in time to see him packing up his telephone, office items and books. At *614 that point, defendant told the Ganas that he had spent their money and was unable to obtain further materials or supplies without new financing.
A subsequent investigation revealed that defendant’s bank account had been overdrawn during the first week in August and that he had used the Ganas’ money to pay his personal bills and overdue business debts. Defendant admitted to investigators that none of the money had been used to purchase materials for the Ganas’ log home kit. When asked whether he intended to compensate the Ganas, defendant first told investigators that he was trying to obtain financing based on the equity he had in the mill. He said nothing further on this subject, however, when confronted with the fact that he did not have an ownership interest in the mill.
In addition to the testimony of the Ganas and several investigators, the People elicited testimony from other customers who had purchased log home kits from defendant and had had similarly unsatisfactory experiences. The evidence furnished by these witnesses, which was admitted primarily on the question of defendant’s larcenous intent, demonstrated that defendant had several other unfilled orders outstanding at the time he accepted the Ganas’ money. It was undisputed that defendant had laid off all of his mill workers and had "shut down” operations at the mill some two weeks before he asked for the Ganas’ money.
In opposition to the People’s case, the defense called two individuals who had purchased log homes from defendant and were completely satisfied with his services. The defense also produced Laurie Mikels, who confirmed that she and her husband had expressed an interest in becoming log home kit dealers for defendant. One additional witness stated that the mill had a small inventory of logs in the early part of the summer of 1990. Two others described the movement of logs on the mill property and the shipment of several truckloads of logs away from the property.
Testifying on his own behalf, defendant described how his business operated and discussed his dealings with the Ganas. According to defendant, he had used the Ganas’ money to buy logs for their kit and, in fact, their logs remained, already milled, on the South Colton property. Responding to testimony from the Ganas and other customers, defendant denied having given them a series of false excuses for his failure to deliver kits that had been ordered and paid for. Defendant further *615 stated that he had been in the process of attempting to obtain financing for his ailing business at the time he was arrested for stealing from the Ganas. Defendant acknowledged having been convicted of two prior crimes: grand theft arising out of a 1984 Florida incident and a Virginia felony.
At the close of the evidence, the trial court, echoing the language of Penal Law § 155.05 (2) (d), instructed the jury on the elements of larceny by false promise and the special burden of proof associated with that crime. The jury thereafter found defendant guilty of third degree grand larceny (Penal Law § 155.35) and third degree criminal possession of stolen property (Penal Law § 165.50). On defendant’s appeal from the judgment of conviction, however, the Appellate Division reversed and dismissed the indictment, holding that the evidence had been insufficient "to show guilty intent on the part of defendant.” (202 AD2d 1013, 1014.) In so ruling, the Court stressed that defendant’s intent not to keep his promise "may not be inferred from the mere nonperformance of the promise” (see, Penal Law § 155.05 [2] [d]). The People now appeal from that Court’s order.

People v King

The incident out of which the charges against defendant King arose began when defendant, who owned a used car business, engaged in a conversation with Carol Bondy, a local print shop owner with whom he had dealt on several occasions. According to the People’s trial evidence, Bondy expressed an interest in buying a small Bronco or Jeep for her son, who would soon be returning home after a stint with the Marines. Within a month, defendant called Bondy to tell her that he had seen a Bronco and planned to acquire it for her at an auction. A few weeks later, defendant drove a two-tone Bronco to Bondy’s shop and offered to sell it to her. With defendant’s permission, Bondy’s boyfriend, Karl Rohrbaugh, took the vehicle for a test drive and pronounced it sound. Bondy then agreed to pay $4,977.50 for the vehicle and gave defendant a $2,000 down payment. This transfer of funds was witnessed by an individual named Fred Peterson, who was in Bondy’s shop to transact business of his own. Peterson, who testified for the People at trial, recalled talking to Bondy about her purchase of the Bronco. According to Peterson, Bondy pointed to the Bronco, which was parked in the parking lot, and he noted that the vehicle, a 1988 bronze and beige model, was the same as the one he had.
*616 The following week, defendant told Bondy that he would need the rest of the money for the Bronco "to get the title processed.” Bondy met with defendant and, in Rohrbaugh’s presence, gave him the additional $2,977.50. Papers, including one for the Department of Motor Vehicles, were signed.
Despite repeated inquiries, defendant failed to deliver the Bronco to Bondy, instead giving her and Rohrbaugh a series of excuses over the course of some 25 conversations. Finally, approximately four months after Bondy had paid defendant for the car, Rohrbaugh confronted him, demanding that he either deliver the vehicle or return the purchase price. At that point, defendant denied having received the full $4,977.50 from Bondy. In a subsequent telephone conversation, defendant told Rohrbaugh that he had spoken to an attorney and had been advised not to say anything else. Shortly thereafter, Bondy received a notice that defendant had brought an action against her in Small Claims Court for $2,000 for "monies due on car deal.” At that point, Bondy contacted the District Attorney’s office to report what she believed to be a crime. Subsequent investigation revealed that no vehicle meeting the description of the two-tone Bronco was ever registered or titled to defendant.
Testifying on his own defense, defendant stated that he had shown Bondy a 1987 black vehicle and agreed to sell it to her for $5,800. According to defendant, he and Bondy later quarreled about the price of magnetic signs that he had ordered from her. Several visits and phone calls failed to bring a resolution to the dispute. After Bondy refused either to refund his deposit or give him the signs, defendant decided to bring an action in Small Claims Court. He identified the action as one for "monies due on car deal” because the magnetic signs that were the subject of the dispute referred to "car deals.” Defendant’s fiancé corroborated his testimony by stating that she had once taken a message from Bondy about the magnetic signs.
At the close of the evidence, defense counsel argued that the jury should be instructed on the elements of larceny by false promise. The prosecutor opposed this request, stressing that the People were alleging that defendant was guilty of larceny by false pretenses. In view of the People’s position, the trial court charged the jury only on the elements of the latter crime. The jury ultimately found defendant guilty of third degree grand larceny. The Appellate Division upheld the *617 resulting judgment of conviction, and defendant King has taken a further appeal by permission of a Judge of this Court.
II.
On this appeal, defendant Norman argues that the trial evidence established that he was guilty of no more than an ordinary civil breach of contract and that the exacting requirements for proving criminal larceny by false promise were not satisfied. Defendant King, who was also convicted of larceny, contends that the case against him was erroneously submitted as a larceny by false pretenses rather than a larceny by false promise and that, accordingly, he was wrongly deprived of the benefit of the higher burden of proof that is required in connection with the latter crime. An assessment of the merits of these claims requires a review of the common-law history and contemporary application of these two types of larceny.
Historically, the crime of larceny, which was created by English Judges rather than Parliament, was narrowly circumscribed to encompass only trespassory takings, most of which entailed some threat to the public peace (People v Olivo, 52 NY2d 309, 315; see, 2 LaFave & Scott, Substantive Criminal Law § 8.1 [a], at 328; 4 Blackstone’s Commentaries, at 229-250; Bassett v Spofford, 45 NY 387; see also, 3 Torcia, Wharton’s Criminal Law § 354, at 298 [14th ed]). As trade and business expanded, however, the English legal system became more sensitive to the need to protect property owners’ interests in personalty. As a consequence, the courts began to create legal fictions which treated certain types of takings as "trespassory” even though the owner had voluntarily relinquished actual physical possession of the property (id.).[1]
For example, a bailee who opened closed bales and misappropriated some or all of the contents was deemed to have committed a "trespassory” taking either because the bailee’s possessory right terminated upon the "breaking of the bulk” or because the package’s contents, as distinguished from its *618 covering, were deemed to continue in the possession of the bailor (id.; see, Carrier’s Case, YB Pasch 13 Edw IV, f 9, pi 5 [1473]). A second category of fictitious "trespassory” takings involved situations in which property that had been entrusted to a person in a special relationship to the owner was nonetheless deemed to have constructively remained in the owner’s possession (2 LaFave & Scott, op. cit., at 329; see, Bazeley’s Case, 2 East PC 571 [Cr Cas Res 1799]; 3 Holdsworth, A History of English Law, at 365 [3d ed 1923]; cf., 39 Geo III, ch 85 [1799] [creating crime of embezzlement]).
The third historical category of larceny, larceny by false pretenses, was originally created as a matter of legislative decree rather than judicial prescription (2 LaFave & Scott, op. cit., at 331-332; see, 30 Geo II, ch 24 [1757]).[2] The gravamen of that offense was obtaining property, with the intent permanently to deprive the owner, by fraudulently inducing the owner to part with both possession and title through the use of false statements about some prior or existing facts.[3] As adopted in New York and many other jurisdictions, the crime of larceny by false pretenses did not apply to the act of obtaining money or property by a false promise to do something (such as repaying a loan or delivering goods) in the future (see, e.g., People v Miller, 169 NY 339, 351-353; Ranney v People, 22 NY 413). Although a promise accompanied by an intention not to perform could theoretically have been viewed as a false statement of an existing fact (see, Chaplin v United States, 157 F2d 697, 700 [Edgerton, J., dissenting]), most courts, including this one, took the narrowest possible view and held that such conduct did not constitute the crime of larceny by false pretenses (People v Blanchard, 90 NY 314, 325). The judicial reluctance to criminalize such conduct was principally derived in concerns about jailing individuals for mere nonpayment of debt and in the courts’ sensitivity to the potential chilling effect that criminalizing such conduct might *619 have on business (see, e.g., People v Churchill, supra, at 156; Chaplin v United States, supra; 2 LaFave & Scott, op. cit., § 8.7, at 387).
It was not until 1965, when the present Penal Law was adopted, that this State recognized the making of a dishonest promise as a crime (Penal Law § 155.05 [2] [d]; see, Third Interim Rep, Temporary State Commn on Revision of Penal Law and Criminal Code, Feb. 1, 1964, at 25). Since that time, the statute defining the crime of larceny has criminalized both wrongful takings by "false promises” and wrongful takings by "false pretenses” (Penal Law § 155.05 [2] [a], [d]).
 With regard to larceny by false pretenses, the Penal Law incorporates the historical elements that were applied at common law, i.e., a false material statement about a past or presently existing fact (Penal Law § 155.05 [2] [a]; see, People v Churchill, supra). With regard to larceny by false promises, Penal Law § 155.05 (2) (d) provides that the crime occurs "when, pursuant to a scheme to defraud, [a person] obtains property of another by means of a representation, express or implied, that he * * * will in the future engage in particular conduct, and when he does not intend to engage in such conduct.” Thus, as adopted in New York, the crime of larceny by false promise is limited to situations in which an individual has made a promise while harboring a present intention not to perform.
While the two crimes have considerable overlap (see, 2 LaFave & Scott, op. cit., at 387), it is important not to lose sight of the distinction between them, particularly in light of the special burden of proof that the Legislature has imposed in prosecutions for larceny by false promise. Because of continuing concerns about the need to avoid prosecution for conduct constituting only civil breach of contract, the Legislature has specifically provided that the inference of guilty intent may not be drawn solely from the fact that the defendant’s promise was not performed (Penal Law § 155.05 [2] [d]; see, People v Churchill, supra; People v Ryan, 41 NY2d 634, 640). Moreover, the Legislature has provided that a conviction of larceny by false promise "may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant’s intention or belief that the promise would not be *620 performed” (Penal Law § 155.05 [2] [d]). That evidentiary standard parallels the burden associated with criminal prosecutions involving wholly circumstantial proof (see, e.g., People v Ford, 66 NY2d 428; see also, People v Geraci, 85 NY2d 359, 371-372).
III.
The Appellate Division concluded that the evidence against defendant was legally insufficient to establish that he acted with larcenous intent under the strict standard set forth in Penal Law § 155.05 (2) (d). The Court’s application of that standard and the dissenter’s comments on the subject here suggest the need for further discussion about the proper standard for appellate review.
Although the trier of fact in the Norman case was bound to consider the evidence in light of the statutory "moral certainty” standard, the function of an appellate court reviewing the record for legal evidentiary sufficiency under Penal Law § 155.05 (2) (d) is limited to assessing whether the inference of wrongful intent logically flowed from the proven facts and whether any valid line of reasoning could lead a rational trier of fact, viewing the evidence in the light most favorable to the People, to conclude that the defendant committed the charged crime (People v Williams, 84 NY2d 925; see, People v Wong, 81 NY2d 600, 608; People v Jennings, 69 NY2d 103; People v Deegan, 69 NY2d 976; see also, People v Geraci, supra, at 371-372). At this level of inquiry, Penal Law § 155.05 (2) (d)’s "moral certainty” standard is not an appropriate criterion for measuring the sufficiency of the People’s proof.
Contrary to the dissenter’s contention, the standard of review we are applying here is not a sudden departure from precedent, but rather is a reflection of well-established principles that have regularly been reiterated in our recent case law. In People v Deegan (69 NY2d 976, 978-979, supra) and People v Jennings (69 NY2d 103, 114-115, supra), we stated that the "moral certainty” standard is only for the trier of fact and that the proper measure of legal sufficiency is whether the facts and the inferences that flow therefrom support a finding for the People on every element of the charged crime. We also stated in Deegan that the availability of innocent inferences is not relevant to the sufficiency inquiry. In so holding, we expressly overruled an older case, People v Eckert (2 NY2d 126, 129), in which the Court stated *621 that the legal sufficiency of circumstantial evidence is determined, at least in part, by whether the facts and inferences "exclude to a moral certainty every other reasonable hypothesis but guilt.” We subsequently made clear that the principles articulated in Deegan and Jennings, both of which involved sufficiency review of indictments-, apply equally to appellate review of legal sufficiency after trial (People v Wong, 81 NY2d 600, 608; see also, People v Geraci, 85 NY2d 359, supra; People v Williams, 84 NY2d 925, 926, supra). The dissenter’s suggestion that the Jennings principle is limited to review of the sufficiency of Grand Jury evidence may be maintained only if this subsequent line of cases is ignored.
To the extent that the dissenter posits a heightened standard of review for all cases in which the moral certainty standard is relevant, the validity of his position is belied by the recent case law. To the extent that the dissenter’s argument is premised on the unique character of larceny-by-false-promise prosecutions, his position cannot withstand analysis. Contrary to the dissenter’s novel construction, Penal Law § 155.05 (2) (d) does not purport to modify or affect the judicially developed standards for appellate review. Rather, the statute’s reference to the "moral certainty” standard merely serves to ensure that the fact finder will be required to utilize that more exacting test in all prosecutions for larceny by false promise, regardless of whether or not the particular prosecution rests on wholly circumstantial proof. As such, the statute mandates no more than that which this State’s application of the constitutional reasonable-doubt standard mandates in wholly circumstantial cases, i.e., that the trier of fact refrain from finding guilt unless it is satisfied that the proof excludes all innocent hypotheses "to a moral certainty.”
Similarly, the older line of cases which the dissenter cites does not provide persuasive support for the theory that legal sufficiency review is different in appeals involving larceny-by-false-promise prosecutions than it is in all other cases in which the moral certainty standard is pertinent. People v Ryan (supra, at 640), People v Churchill (47 NY2d, at 158, supra) and People v Luongo (47 NY2d 418, 429), were all decided before the clarifying holdings in Jennings, Deegan and their progeny — at a time when the Court frequently intermingled "moral certainty” verbiage with its legal sufficiency analysis. Indeed, during the same era, moral certainty verbiage was also injected into sufficiency decisions in appeals involving prosecutions based on wholly circumstantial proof *622 (see, e.g., People v Montanez, 41 NY2d 53; People v Benzinger, 36 NY2d 29; People v Cleague, 22 NY2d 363). Just as this Court would now avoid that type of fact-based analysis in circumstantial-evidence sufficiency appeals, so too must we avoid engaging in such fact-based analysis in sufficiency appeals from convictions for larceny by false promise.
Significantly, the discussion in Jennings on which the dissenter relies (dissenting opn, at 629) did not distinguish at all between the "Ryan line of cases” and the cases in which the moral certainty standard was pertinent because of the circumstantial nature of the proof. On the contrary, Ryan was cited interchangeably with the latter class of cases (see, 69 NY2d, at 114, citing People v Ryan, supra; People v Borrero, 26 NY2d 430; People v Cleague, supra; People v Bearden, 290 NY 478; People v Newman, 80 Misc 2d 975, affd 85 Misc 2d 761), thereby confirming that this Court has not previously viewed Penal Law § 155.05 (2) (d) as requiring a unique level of sufficiency review.
Finally, we eschew the "moral certainty” standard as an appropriate measure for legal sufficiency review because its application would blur the important distinction between the role of the fact finder and that of the reviewing court. Evaluating the evidence to determine whether it is "wholly inconsistent with innocent intent or belief’ and whether it "excludes] to a moral certainty every hypothesis except that of [guilty] intention” (Penal Law § 155.05 [2] [d]) requires such mental operations as sifting through the proof, drawing the plausible inferences and, most critically, weighing the strength of those inferences. The very term "moral certainty” connotes that the decision-maker must possess a particular degree of conviction about the correctness of its conclusion, thereby demonstrating the test’s unsuitability for the more objective legal sufficiency inquiry. In the absence of a clear indication of a contrary legislative intent, we decline to construe Penal Law § 155.05 (2) (d) as modifying the concept of "legal sufficiency” — a concept that has its roots in the constitutional and statutory limitations on our review powers.
IV.

People v Norman

Viewed under the prism of the appropriate appellate review standard, the evidence against this defendant was sufficient to establish his guilt of larceny by false promise on *623 the theory that he took the Ganas’ money at a time when he had no intention of delivering the log cabin kit he had promised them. The jury was entitled to believe the evidence that defendant had pressured the Ganas into giving him the full purchase price of the kit they had ordered and had then spent all of their money on past-due personal and business bills without using any of it to purchase materials for their kit. There was also evidence that defendant had laid off his mill workers approximately one week before he took the Ganas’ money, that he had closed his bank account shortly after paying his bills and that he was unable to obtain more suppliers or services without new financing. This evidence that, at the time he took the Ganas’ money, defendant lacked the wherewithal to perform and had no realistic prospect of changing the situation in the near future provided ample ground for a jury to “[exclude] to a moral certainty every hypothesis except that of defendant’s intention or belief that [his] promise would not be performed” (Penal Law § 155.05 [2] [d]).
The additional evidence that defendant had offered a series of dubious excuses for failing to deliver the victims’ logs, that he had business dealings with other customers with similar results and that he had been caught packing up his office equipment when the Ganas went to his office to confront him lent further support to the inference that defendant had intended to bilk the Ganas from the outset (see, People v Rolchigo, 33 AD2d 1060, affd 28 NY2d 644). Finally, defendant’s patently false statement to investigating officers that he planned to compensate the Ganas by using his equity in the mill — a property he did not own — furnished additional circumstantial proof of his criminal intent at the time he took the Ganas’ payment.
In this regard, we note our rejection of defendant’s suggestion that his guilty intent not to perform should be assessed solely on the evidence concerning the situation on July 19, 1990, the date he and the Ganas entered into a formal contract for the purchase of a log home kit. Under the circumstances of this case, an equally and perhaps even more relevant point for the jury to consider defendant’s intent was August 8, 1990, the date on which defendant received and accepted the Ganas’ money.
We further note that this Court’s holding in People v Churchill (supra) does not require a rejection of the sufficiency *624 of the People’s case here. While the Churchill Court held that the accused’s failure to perform as promised coupled with his use of the customer’s down payment for personal expenses did not suffice to establish larceny by false promise, the Court also went on to note that “the record [wa]s devoid of any proof that defendant would require additional funds for the completion of the work remaining to be done on the contracts” (id., at 158). Here, in contrast, there was evidence that defendant himself had admitted that, having spent the Ganas’ money on his own expenses, he would need additional funds to obtain materials and supplies for their log home. Further, there was proof from which the jury could infer that, unlike the Churchill defendant, this defendant, whose mill was already closed and without a crew of workers by the time he took the money, could not have performed even if he had had the necessary materials and supplies.
Finally, the legal sufficiency of the People’s trial evidence was not negated by defendant’s efforts to show through his own testimony and that of his witnesses that there were prepared logs for the Ganas at the mill, that he had an adequate inventory of logs on the premises and that the mill was shipping logs to other destinations during the summer of 1990. The jury was entitled to reject defendant’s attempt to establish his ability to perform, particularly in light of the tentative and somewhat inconsistent nature of the evidence he presented. Accordingly, the Appellate Division erred in holding that defendant’s conviction for larceny by false promise should be vacated.

People v King

Defendant King, who was convicted of larceny by false pretenses, failed to preserve his present claim that the evidence against him was insufficient because it failed to demonstrate the existence of a false representation concerning a presently existing fact. Although at the close of the evidence defense counsel made a motion to dismiss for failure of the prosecution’s proof, his arguments were confined to a claim that the People’s witnesses were not credible. Counsel did not argue, as appellate counsel argues now, that an essential element of the crime had not been proven. Accordingly, the present sufficiency argument cannot be reviewed in this Court (see, People v Bynum, 70 NY2d 858).
Defendant’s remaining claim seeks to capitalize on the similarity between the crimes of larceny by false pretenses *625 and larceny by false promise. Reiterating the contention his attorney made at trial, defendant argues that the People’s case against him was actually one for larceny by false promise rather than larceny by false pretenses and that the former crime should have been submitted to the jury in place of the latter. The erroneous refusal to submit the case as a larceny by false promise prosecution was highly prejudicial, defendant contends, because it deprived him of the opportunity to have the jury consider the evidence of his intent under the far more exacting standard of proof prescribed for that crime (see, Penal Law § 155.05 [2] [d]).
To the extent that this claim does not overlap with defendant’s unpreserved sufficiency argument and is therefore reviewable, it is utterly lacking in merit. In addition to showing that defendant had made an unfulfilled promise to deliver a particular car, the trial evidence supported the inference that defendant had made a material misrepresentation of fact to Bondy, namely that he owned the vehicle in question and therefore had the power to sell it to her. While defendant never made a specific oral claim that the bronze and beige Bronco was his to sell, his conduct conveyed as surely as a direct statement that he had an interest in the Bronco sufficient to enable him to transfer ownership to her (see, 2 LaFave & Scott, op. cit., at 384 [a conviction for larceny by false pretenses can rest on unwritten expression or unspoken conduct]). This conduct included his first telling Bondy that he had seen a particular Bronco and planned to acquire it for her at auction and then bringing a Bronco to Bondy’s shop for a test drive. It also included his telling Bondy he needed the rest of her money "to get the title processed” and giving her Department of Motor Vehicle forms to sign.
In sum, there was more to the case against defendant King than a simple false promise made with an intent not to perform. Accordingly, the prosecution was entitled to choose to prosecute him for larceny by false pretenses rather than for larceny by false promise. The fact that the evidence might have also supported a false promise theory is of no moment, since, as long as their theory was supported by the adduced facts, the People had the right to have the case submitted to the jury under the Penal Law subdivision they had chosen.
Accordingly, in People v Norman, the order of the Appellate Division should be reversed and the case remitted to that Court for a review of the facts (see, CPL 470.25 [2] [d]; 470.40 *626 [b]); in People v King, the order of the Appellate Division should be affirmed.

. It has been suggested that the early treatment of all felonies as capital offenses was responsible, at least in part, for the English courts’ confinement of the crime of larceny to a relatively narrow class of cases (People v Churchill, 47 NY2d 151, 155; ALI, Model Penal Code § 223.1, Commentary, at 128-129 [1980]; 3 Torcia, op. cit., § 354, at 300; but see, People v Olivo, supra, at 315, n 1, citing Fletcher, Metamorphosis of Larceny, 89 Harv L Rev 469, 483-484).

. This shift in the law-making initiative from the judiciary to the legislative body occurred as part of an over-all trend that arose toward the end of the 18th century as a result of a number of factors, including the expansion of the prestige and power of Parliament and a change in the perceived role of Judges from policy-makers to interpreters of "natural law” (see, ALI, Model Penal Code § 223.1, Commentary, at 128-129 [1980]).

. The common-law crime of "larceny by trick,” which had been created by the courts at an earlier point in history, was limited to situations in which possession of, but not title to, the property had been obtained by the wrongdoer’s false statements (see, People v Olivo, supra, at 316; 2 LaFave & Scott, op. cit, at 331; 3 Torcía, op. cit, § 355, at 301).