[724 NYS2d 702]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VIN-
CENT NAPOLITANO, Appellant.

First Department, April 12, 2001

50

## APPEARANCES OF COUNSEL

*Vivian Shevitz* for appellant.

*Marc Frazier Scholl* of counsel (*John W. Moscow* and *Adam A. Reeves* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

ANDRIAS, J.

The trial evidence established beyond a reasonable doubt that defendant engaged in conduct known in Federal jurisprudence as insider trading, and we are in agreement that this conduct violated the Martin Act (General Business Law art 23-A) and the Penal Law provisions under which defendant was convicted.

Such convictions were based upon evidence that Marisa Baridis, an employee first of Smith Barney, Inc. and then of Morgan Stanley, Dean Witter, Discover & Co. (hereinafter collectively Smith Barney), who worked in their respective "control groups," supplied defendant's partner Jeffrey Streich (and, through him, defendant) with confidential, nonpublic information about prospective corporate actions, such as takeovers, mergers and acquisitions, which were likely to enhance the value of the corporation's stock, and that defendant and his partner, on the basis of such information, then purchased stock in such companies, thereby realizing substantial short-term profits, a portion of which they shared with Baridis in return for her ongoing supply of information.

Contrary to defendant's principal argument, the People were not required to prove that Baridis, who was the source of the insider information, was an "insider" of the corporations whose securities were purchased by defendant. Under any theory of insider trading, Baridis's duty not to trade on the confidential information that she obtained by virtue of her position of confidence and trust extended to defendant because there was sufficient proof that he knew or should have known that the material information was confidential and wrongfully obtained (*see, United States v O'Hagan*, 521 US 642). In this regard, there was overwhelming evidence, including properly corroborated accomplice testimony, that defendant knew he was receiving wrongfully obtained confidential information.

Defendant, perhaps taking his cue from a New York Law Journal article critical of the trial court's dismissal motion analysis of Federal insider trading law (John F. X. Peloso and Stuart M. Sarnoff, Securities and Commodities Litigation, *State Law Insider Trading Prosecution Under Martin Act,* NYLJ, Oct. 15 1998, at 3, col 1), argues that none of the Penal Law charges are sustainable, as a matter of law, by evidence of a breach of duty to the corporate shareholders who were defendant's alleged victims.

The trial court upheld the Penal Law charges upon the ground that the tippees of the Baridis information had a duty which was derivative of Baridis's duty to shareholders arising from her status as a "corporate insider" (citing *Matter of Cady, Roberts & Co,* 40 SEC 907). Defendant asserts that since Baridis was not a corporate insider, but rather was a corporate "outsider," like the defendant in *United States v O'Hagan* (521 US 642), she had a duty of disclosure only to her employer and not to the shareholders of the corporations whose stock he traded. Thus, according to defendant, even if he knew of Baridis's duty, he obtained no stolen property from her employer, thus rendering "larceny" concepts inapplicable. With respect to criminal possession of stolen property and conspiracy, defendant argues that since there was no duty to disclose to the shareholders, there could be no larceny by false pretenses. Absent a duty to shareholders, he urges, there also could be no scheme to defraud them. Finally, defendant also argues that, at the very least, the trial court should have considered the "rule of lenity" and determined that the requirements of the larceny, fraud, and stolen property statutes were not properly applied (*cf., Matter of Kimberly H.,* 196 AD2d 192).

█ The context in which defendant raises these arguments on appeal is somewhat confused, but, in any context, the "lack of evidence of duty" argument is unpreserved for appellate review (CPL 470.05 [2]). Although defendant joined in the motion to dismiss the indictment raising these arguments, any challenge to the sufficiency of the Grand Jury evidence "is not reviewable upon an appeal from an ensuing judgment of conviction based upon legally sufficient trial evidence" (CPL 210.30 [6]). To the extent that defendant's arguments constitute a challenge to the legal sufficiency of the trial evidence, they also are unpreserved (*see, People v Gray,* 86 NY2d 10). At the conclusion of the People's case, defense counsel's motion for a trial order of dismissal did not raise the arguments now advanced on appeal.

Furthermore, defendant suggests that his conviction should be reversed because the court's charge to the jury was based upon "the inapt notions decided in the pre-trial decision that embraced concepts of duties to 'contraparty' traders that do not exist." Again, however, any argument about the impropriety of the court's charge in this regard is unpreserved as defense counsel proposed standard CJI instructions and made no complaints pertaining to the elements of the Penal Law charges.

Finally, for the first time in his reply brief, defendant suggests that, if this Court determines that his appellate arguments are unpreserved, he is entitled to relief based on the ineffective assistance of his trial counsel in failing to make appropriate objections. The People move to strike such argument from defendant's reply brief. Defendant's appellate counsel opposes on the ground that such argument is raised in response to the People's non-preservation argument in their respondent's brief and, in the alternative, cross-moves for coram nobis relief on the ground of her own ineffective assistance on appeal in not raising such argument in her main brief. Defendant's arguments must be rejected both procedurally and on their merits, first, because they are improperly raised for the first time in his reply brief or are premature and, secondly, because it is clear that defense counsel's trial representation overall, which included numerous challenges, was quite adequate. The record establishes that defendant received meaningful representation (*see, People v Benevento*, 91 NY2d 708, 713-715). We also decline to review these claims in the interest of justice. Were we to do so, we would find the evidence to be legally sufficient as to each conviction.

■■ A jury's verdict is supported by sufficient evidence if the evidence presented supports "any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury" (*People v Bleakley*, 69 NY2d 490, 495). The jury was certainly warranted in finding defendant guilty of possession of stolen property, conspiracy and scheme to defraud based upon the proof establishing that he knowingly participated in an ongoing scheme to profit from material, nonpublic information obtained in violation of both Baridis's fiduciary duty to Smith Barney, and, through Smith Barney, to the companies whose trust she also abused. As a result, defendant unlawfully obtained more than $50,000 in stolen property from the contraparties to those transactions.

Defendant suggests that under Federal law, which indisputably provides important precedent for courts of this State in

determining the obligations of persons who trade in securities, he had no duty to refrain from using the confidential information he obtained from Baridis, who was not a corporate insider. However, as the People argue at length, whether the facts of this case are analyzed under a "classical corporate insider" theory (*Dirks v Securities & Exch. Commn.*, 463 US 646) or a "misappropriation" theory (*United States v O'Hagan, supra*), it is clear that defendant had a duty to abstain from trading absent disclosure of wrongly obtained material, nonpublic information.*

The *O'Hagan* Court's description of these two theories of insider trading liability is instructive:

"Under the 'traditional' or 'classical theory' of insider trading liability, § 10 (b) [of the Securities Exchange Act of 1934; 15 USC § 78j (b)] and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a 'deceptive device' under § 10 (b), we have affirmed, because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.' *Chiarella* v. *United States,* 445 U.S. 222, 228 (1980). That relationship, we recognized, 'gives rise to a duty to disclose [or to abstain from trading] because of the "necessity of preventing a corporate insider from * * * tak[ing] unfair advantage of * * * uninformed * * * stockholders." ' *Id.*, at 228-229 (citation omitted). The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. See *Dirks* v. *SEC*, 463 U.S. 646, 655, n. 14 (1983).

---

* The New York Law Journal article mentioned above was critical of the trial court for relying on the "classical" theory of insider trading because the authors believed that Baridis was not a "corporate insider" and therefore, she did not owe a duty, fiduciary or otherwise, to the shareholders of corporations whose stock was being traded. However, the authors believed that it would have been appropriate for the trial court to extend criminal insider trading liability to those who had traded on material nonpublic information misappropriated by a corporate outsider, such as Baridis.

"The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10 (b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. * * * Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

"The two theories are complementary, each addressing efforts to capitalize on nonpublic information through the purchase or sale of securities. The classical theory targets a corporate insider's breach of duty to shareholders with whom the insider transacts; the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information. The misappropriation theory is thus designed to 'protec[t] the integrity of the securities markets against abuses by "outsiders" to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders.' *Ibid.*" (*O'Hagan*, *supra*, at 651-653.)

While it may be argued that Baridis was not a corporate insider, the important point in determining the liability of a Baridis tippee is that Baridis improperly used the confidential nonpublic information for personal gain and thereby committed fraud in the use of the information she obtained in breach of her duty. Any reliance on *Dirks* (*supra*) is misplaced inasmuch as, in that case, the insiders, unlike Baridis, had not acted for personal profit, but to expose a massive fraud within the corporation (463 US, *supra*, at 666-667). As found by the Court in *O'Hagan* (*supra*, at 663): "*Dirks* thus presents no sug-

gestion that a person who gains nonpublic information through misappropriation in breach of a fiduciary duty escapes § 10 (b) liability when, without alerting the source, he trades on the information." The duty not to use the confidential information for personal benefit thus extends to the Baridis tippees, not because these individuals are deemed to owe a fiduciary duty to Baridis's employer, but rather because of the fraudulent nature of the use of the confidential information.

For instance, the core of the false pretenses larceny theory is that the victim surrenders property on the basis of misrepresentations attributable to the defendant; here, by his trading, defendant falsely communicated that he was permitted to trade even though he had a duty to disclose the confidential information or to abstain from such trading. Although he made no affirmative representation, an omission satisfies the elements of larceny by false pretenses where there is a duty, such as defendant's, not to trade absent disclosure of nonpublic material information.

Indeed, as the People point out in their brief, there was concrete testimony by an owner of corporate stock, which defendant illegally purchased, that the owner's decision whether to sell his stock was greatly affected by his reliance on the integrity of the playing field, and therefore, defendant clearly came into possession of property sold by the stock owner as a result of his omission to disclose the material, nonpublic information.

There is also no merit to defendant's unpreserved "rule of lenity" argument since the applicability of the Penal Law statutes is not ambiguous. Here, as demonstrated above, defendant's conduct in using material nonpublic confidential information to trade in securities is encompassed within the definitions of the Penal Law statutes at issue.

The trial court properly exercised its discretion in denying defendant's mistrial motions made in connection with two instances of alleged prosecutorial misconduct. With regard to one instance, the record fails to support defendant's claim that the prosecutor intentionally elicited testimony that violated the court's order excluding certain hearsay references to defendant, and, in any event, the testimony elicited was harmless. As to the other instance, while it was inappropriate for the prosecutor to pose a question that could be viewed as suggesting that evidence was being kept from the jury, the witness's response dispelled any possible prejudice.

Finally, since the SEC investigator refused to provide the District Attorney's office with notes of his interviews with de-

fendant, this information was not in the possession or control of the People and thus did not constitute *Rosario* material (*People v Rodriguez*, 155 AD2d 257, *lv denied* 75 NY2d 923).

Accordingly, the judgment of the Supreme Court, New York County (Edward McLaughlin, J.), rendered February 23, 2000, convicting defendant, after a jury trial, of criminal possession of stolen property in the second degree, conspiracy in the fourth degree, scheme to defraud in the first degree (two counts), violation of General Business Law § 352-c (5) and violation of General Business Law § 352-c (6), and sentencing him to an indeterminate term of from 2 to 6 years imprisonment on his conviction for possession of stolen property, which sentence is to be served concurrently with the indeterminate terms of from 1⅓ to 4 years imprisonment imposed on the remaining convictions, should be affirmed. Motion to strike reply brief granted to the extent of deeming point II A. stricken. Cross motion for coram nobis relief dismissed as premature. Motion to reargue bail application denied in light of our affirmance.

SAXE, J. (dissenting in part). This case marks the first time a felony charge of insider trading has been prosecuted by a New York State District Attorney under the Martin Act (General Business Law art 23-A).[1] It requires us to consider the showing necessary to support a felony conviction for violations of the Martin Act, based upon a claim of insider trading, and further, to decide whether trading securities based upon nonpublic, confidential inside information, satisfies the elements of criminal possession of stolen property in the second degree and scheme to defraud in the first degree. I agree with the majority that defendant's conviction for violation of General Business Law § 352-c (6) was proper. However, I differ to the extent the majority holds, in essence, that the purchase of securities based upon inside information constitutes either a larceny or a scheme to defraud the shareholders whose stock he purchased.

*FACTS*

At the heart of the case against defendant Vincent Napolitano is the conduct of Jeffrey Streich, a corrupt and dishonest former stockbroker[2] whose license had already been suspended or revoked by the time he associated himself with Napolitano.

---

1. A misdemeanor charge prosecuted by the New York State Attorney General was the subject of *People v Florentino* (116 Misc 2d 692).

2. It is not disputed that Streich's history as a broker was replete with fraud and dishonesty. Just prior to his involvement in business with Napolitano, Streich had fraudulently obtained $200,000 from investors for his

The evidence at trial established that defendant Vincent Napolitano went into business to engage in stock trading, with the intent to purchase initial public offerings (IPOs). Napolitano leased an apartment which was used as an office, equipped it with computers providing stock and market-related information, and opened numerous brokerage accounts, both in his own name and in the names of several dummy corporations. In the early summer of 1996, Streich testified, he "went into business" with Napolitano. Streich was provided with a key to the office, and he worked there on a daily basis. Streich also referred Napolitano to a number of brokers with whom he was acquainted, and Napolitano set up additional accounts with these brokers, in the names of his various corporations.

That summer, Streich became acquainted with Marisa Baridis, who was working in the "control group" of Smith Barney. The control group monitored confidential, nonpublic information obtained from Smith Barney corporate clients about planned corporate takeovers, restructurings, mergers and acquisitions, and other investment-banking transactions. This confidential information was placed on a "watch list" database which the control group then monitored. The group was responsible for detecting possible disclosure and use of that information by Smith Barney brokers or clients.

Baridis and Streich began meeting socially, and Baridis, who admitted to being attracted to Streich, told Streich about her job at Smith Barney. Streich repeatedly attempted to convince Baridis to share her information with him. Though initially resistant, at a dinner some time around Labor Day 1996 Baridis informed Streich about a company on the Smith Barney "watch list" called Square Industries which was to be sold to another company in two weeks. Baridis told Streich the relevant information surrounding Square Industries, including the expectation that the value of the company's stock would increase by 20%. Because she was concerned about being detected, Baridis cautioned Streich not to buy more than 5,000 shares, not to buy options, not to tell anyone about his source and not to buy all the shares in one account. Streich assured Baridis that he

---

personal use by misrepresenting to them that they were investing in a "private placement," a company he set up called LJS Holdings whose purpose, he asserted, was to open a laundromat/café. Indeed, the underlying investigation arose from the investigation of another scheme by which Streich defrauded an investor: he forged authorizations in order to trade on a portfolio of an account holder whose account contained hundreds of thousands of dollars; when Streich was through, the account's value was reduced by approximately $400,000, and Streich had profited.

and his partner had several accounts and traded in large quantities, and that any trades they conducted would be in different accounts.

According to Streich, that night or the next day he told defendant of Baridis's job at Smith Barney, and explained that she could provide them with nonpublic information with which they could make a lot of money. Streich also informed defendant that Baridis told him that they should buy Square Industries. Streich and defendant also agreed that they should not tell too many people about the information, and that they should not buy options because that would send up red flags.

On September 5, 1996, defendant purchased 1,000 shares of Square Industries for $10,840 through an account in the name of Landmark Associates, established at the brokerage firm GKN Securities Corp. The value of the stock thereafter climbed, and a week later defendant sold it for $13,485, at a profit of over $2,000.

According to Baridis, she began to speak with Streich regularly, and learned that Streich worked with a partner named "Vinnie," who supplied the funds for making investments. Defendant told Streich that Baridis should not call the office, although eventually Streich gave Baridis defendant's beeper number, which Baridis wrote in her phone book. Baridis began to provide Streich with confidential information on an ongoing basis, which Streich in turn relayed to defendant.

In late September 1996, Baridis went to defendant's office to demand money from Streich, which he owed her according to their arrangement. Streich, who was there alone at the time, told her the apartment was leased by defendant. He talked her into giving him a new tip before he paid her, and she gave him new information about Starsight Telecast, Inc., which was expected to announce a merger with another company, Gemstar, in two or three weeks. Streich then agreed to pay her $700 for the Square Industries information.

Streich informed defendant of the Starsight information, and defendant then bought over $100,000 worth of Starsight stock, through several accounts, between September 30 and October 4, 1996. However, on October 9, the Smith Barney watch list indicated a 50% chance that the Starsight deal would not go through. During the period of uncertainty about the Starsight deal, Baridis went to the office a second time, where she was introduced to "Vinnie," i.e., defendant. Streich mentioned to Baridis the delay in sale of Starsight, while they were in the presence of defendant and another man. According to Baridis,

defendant looked up from the computer game he was playing and began to listen to the conversation intently.

During this meeting, also in defendant's presence, Baridis demanded payment from Streich. At that point, defendant and Streich went into a bathroom together, closed the door, and, upon emerging, Streich paid Baridis $3,000 cash. Expecting more money, Baridis complained to Streich, in defendant's presence, that she was the person who could get into the most trouble since she owed a duty to the company. Streich promised to pay her more money at a later time. Later that evening, Baridis was at a bar with some friends, and noticed defendant and Streich. Defendant purchased a round of drinks for Baridis's group, and when she looked over, he lifted his glass to Baridis in an apparent toast from across the room.

Over the weeks that followed, Baridis provided information to Streich regarding additional stocks, which defendant invested in as follows: Owen Healthcare, Inc. (Owen), $256,043.11; GMIS, Inc. (GMIS), $95,155; Coram Healthcare Corp. (Coram), $78,272.50; Health Images, Inc. (Health Images), $59,858.95; Pacific Rehabilitation, $40,106.25. These accounted for five of defendant's six largest investments during that time period.

Ultimately, defendant and Streich began to share the confidential information with others. In October 1996, they met with Brett Hirsch, a broker who had previously supervised (and taught) Streich, and David Shapiro, who worked with Hirsch. Defendant wanted Hirsch to provide him with IPO information, and revealed that Streich was, "on a regular basis," receiving "good information on stocks." Defendant then informed Hirsch and Shapiro of the watch list information obtained from Baridis, as to the planned merger of Coram Healthcare with Integrated Health Systems. However, neither man acted on the tip.

According to Howard Boyar, one of defendant's stockbrokers, who was friendly with Streich, defendant also remarked to him regarding how good Baridis's information had been with respect to Owen Healthcare.

Because he wanted to make investments without paying for them, Streich needed additional brokers to "free ride,"[3] so in order to do so, he shared the Baridis information with these

---

3. "Free riding" is an arrangement where the broker puts through a trade without the investor's payment, which a broker would normally hesitate to do without substantial assurance that the value of the stock will increase,

other brokers. Streich also arranged for these individuals to contribute from their profits to pay Baridis.

Extensive trading in Owen Healthcare in late November 1996, which included defendant's purchase of shares worth $256,043, triggered investigations culminating with an investigation by the SEC. In 1996, Paul Cellupica, an SEC staff attorney, was assigned to the Owen case. Out of the thirty-five suspicious Owen accounts, five were in defendant's name.

Cellupica left a message for defendant at his office, which defendant discussed with Streich. The two agreed that defendant would say that the Owen stock had been mentioned casually on the golf course. In a telephone interview with Cellupica in January 1997, in which he was represented by counsel, defendant identified his businesses and their account activity; indicated that he could not recall discussing the Owen stock with anyone prior to the purchase; and never mentioned Jeffrey Streich.

In July 1997, Cellupica took a sworn statement from defendant, represented by counsel, in which defendant denied that anyone worked with him, or that anyone had a direct or indirect interest in his corporations. Defendant attempted to conceal his partnership with Streich, deliberately mispronouncing his last name. Even after this conversation, however, defendant and Streich continued to trade on the Baridis tips.

In his testimony, stockbroker Howard Boyar said that after defendant's interview with Cellupica, defendant assured Boyar that he, Napolitano, had been less than candid in speaking to the SEC investigator.

Streich eventually learned that the New York County District Attorney's office was investigating his criminal conduct with respect to one of his former brokerage firms. Streich thereafter agreed to cooperate with the investigation and disclosed his involvement with Baridis in illegal stock trading. Because he considered defendant his friend, Streich did not initially disclose his involvement.

Pursuant to his agreement with the District Attorney's office, Streich agreed to set up Baridis by means of an audio- and video-taped restaurant meeting in which they discussed the inside trading activities and Streich paid Baridis $2,500 of marked cash. A copy of the videotape was admitted into evidence. Although Streich had attempted to conceal defendant's

since it puts the broker at financial risk for the full amount of the investment.

involvement, at one point during this meeting Baridis specifically asked Streich if he had told Vinnie, and whether Vinnie was still "in on it."

*Analysis*

Defendant's challenge to his conviction of Martin Act violations is premised upon the concept that, while Streich gave him "tips" upon which he acted, defendant did not know that they were based on wrongfully obtained, confidential inside information, misappropriated by someone who had no right to disclose the information. He contends that there was insufficient non-accomplice testimony to establish the knowledge element required for a conviction.

The basic framework of the Martin Act was designed to "protect the public from fraudulent exploitation in the *offering and sale* of securities" (*People v Landes*, 84 NY2d 655, 660 [emphasis added]). Its primary focus has been on protecting investors from fraud in the sale of securities (*see*, Mihaly and Kaufmann, Practice Commentaries, Securities, Commodities and Other Investments, McKinney's Cons Laws of NY, Book 19, General Business Law art 23-A, at 25 ["the fundamental purpose of the Martin Act is to insure that prospective *purchasers* of securities, commodities and real estate securities offered or sold in or from New York are furnished with sufficient factual information * * * by means of dissemination of full and fair disclosure of all 'material' facts" (emphasis added)]). Nevertheless, section 352-c specifically prohibits fraud in either the sale *or the purchase* of securities.

Indeed, the language of section 352-c (6) is similar to the Federal prohibition against insider trading, rule 10b-5 of the Securities and Exchange Commission, promulgated under section 10 (b) of the Securities Exchange Act of 1934 (15 USC § 78j [b]), which prohibits engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security" (17 CFR 240.10b-5 [c]).

Subdivision (6) of section 352-c of the General Business Law prohibits "intentionally engag[ing] in fraud * * * while engaged in inducing or promoting the * * * sale * * * or purchase within or from this state of any securities" when the defendant thereby wrongfully obtains property valued at more than $250 (General Business Law § 352-c [6]).

Under the "misappropriation" theory of insider trading first adopted by the United States Supreme Court in *United States*

*v O'Hagan* (521 US 642, 652), "a person commits fraud 'in connection with' a securities transaction * * * when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." This approach provides the rationale for defendant's conviction under General Business Law § 352-c (6). Baridis's duty not to disclose the information she had been hired to protect from misuse, which duty she owed to Smith Barney, extended to those to whom she provided the information (*see, Securities & Exch. Commn. v Maio*, 51 F3d 623, 631; *United States v Newman*, 664 F2d 12; *see also, Dirks v Securities & Exch. Commn.*, 463 US 646, 659). Therefore, Streich and his cohorts, including defendant, "misappropriate[d] confidential information for securities trading purposes, in breach of a duty owed to the source of the information" (*see, O'Hagan, supra*, at 652), and by doing so, engaged in fraud while inducing the sale or purchase of securities, thereby satisfying the elements of section 352-c (6).

Defendant's challenge to the sufficiency of the non-accomplice testimony is meritless. While the showing that defendant knew the information he got from Streich had been wrongfully misappropriated was largely through the testimony of Baridis and Streich, the corroborative evidence required by CPL 60.22 need only be enough "to assure that the accomplices have offered credible probative evidence" (*see, People v Breland*, 83 NY2d 286, 293). It need not establish each element of the crime (*id.* at 292-294). The remaining evidence more than satisfies this standard.

Even if corroboration on the knowledge element were necessary, sufficient non-accomplice evidence on the point was offered. David Shapiro, to whom defendant boasted that Streich was getting "some information on certain stocks" on a "regular basis," cannot properly be considered an accomplice under CPL 60.22 (2), since there is no evidence that Shapiro participated in the insider trading. Furthermore, the testimony of Paul Cellupica, the SEC attorney who participated in an investigation of the Owen trades, reflected that defendant falsely told him that he made all his own trading decisions. This falsehood alone also supports the inference that defendant knew he had participated in illegal conduct which had to be hidden.

*Larceny Charges*

While defendant's proven conduct establishes a violation of General Business Law § 352-c (6), the application of the concept of larceny to these facts is more troublesome. I would reverse

defendant's conviction for the charged larceny crimes,[4] concluding that while he traded on inside information, he may not be said to have stolen the shares of stock he purchased in those trades.

The definition of criminal possession of stolen property requires that the property to which this statute applies must be tangible, rather than intangible (*see*, Penal Law § 10.00 [8]). Thus, the crime cannot apply to that which was truly stolen here, namely, the information improperly taken by Baridis from Smith Barney.

The People contend that the property stolen by defendant is the securities obtained by defendant from their prior owners, and the profits gained that otherwise would have properly belonged to the prior owners. As to the element that the property have been stolen, the People assert that defendant obtained it by false pretenses.

A showing of larceny by false pretenses requires that the property have been obtained " 'by means of an intentional false statement concerning a material fact upon which the victim relied in parting with the property' " (*see, People v Termotto*, 81 NY2d 1008, 1009 [citation omitted]). Here, the People contend that defendant's failure to disclose to the selling shareholders that he had inside information amounts to a material omission which satisfies the larceny requirements.

The problem with this concept is that in the marketplace, a buyer has no obligation to disclose special knowledge that the true value of property being offered for sale is far greater than that which the seller believes it to be. Of course, an omission to disclose a material fact is enough *if the defendant had an affirmative duty to disclose it*. However, "[t]here is no ' "general duty between all participants in market transactions to forgo actions based on material, nonpublic information" ' " (*United States v O'Hagan*, 521 US 642, 663, quoting *Dirks v Securities & Exch. Commn.*, 463 US 646, 655, quoting *Chiarella v United States*, 445 US 222, 233).

The People contend that defendant was bound by a fiduciary duty toward his "contraparties," that is, the shareholders sell-

---

4. Inasmuch as the pre-trial ruling upholding these counts was based upon a showing which was mirrored at trial, I would consider defendant's challenge to the viability of the larceny counts sufficiently preserved under CPL 470.05 (2). It would exalt form over substance to require defendant to make a post-trial motion to dismiss on the exact same grounds raised—and rejected—earlier, in order to preserve his argument. However, even if defendant's challenge to the viability of the larceny charges were deemed unpreserved, I would consider it in the interest of justice.

ing the stock he purchased, to either disclose his information or refrain from trading on it. However, while a fiduciary duty is owed to the shareholders by a corporate "insider," meaning an officer, director, controlling shareholder, or an agent of the corporation (*see, Dirks v Securities & Exch. Commn.*, 463 US 646), no such duty is owed by corporate "outsiders" (*see, O'Hagan, supra*, at 662). Indeed, the adoption of the misappropriation theory of insider trading was "designed to 'protec[t] the integrity of the securities markets against abuses by "outsiders" to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but *who owe no fiduciary or other duty to that corporation's shareholders*'" (*O'Hagan, supra*, at 653 [citation omitted; emphasis added]).

Defendant here, like the defendant in *O'Hagan*, is clearly an "outsider" rather than an "insider." Mr. O'Hagan was a partner at the law firm of Dorsey & Whitney, which had been retained by Grand Metropolitan plc (Grand Met) to represent it regarding a potential tender offer for the common stock of the Pillsbury Company. The trades in question were O'Hagan's purchase of shares of Pillsbury stock and call options. The Court explained that it was O'Hagan's failure to disclose his personal trading *to Grand Met and Dorsey*, in breach of his duty to do so, that made his conduct wrongful (521 US at 660), not his breach of a fiduciary duty to the owners of the Pillsbury stock he purchased.

Like Mr. O'Hagan, Marisa Baridis, and defendant through her, owed a duty not to trade on the confidential information in her possession, but that duty was owed to Baridis's employer, *not* to the shareholders of the purchased stocks. This duty, as the *O'Hagan* decision makes clear, does not translate to a general, absolute duty owed to all the affected corporate shareholders to disclose the information or refrain from trading. The suggestion that such an absolute duty exists, applicable to anyone with material nonpublic information, was rejected by the majority in *Chiarella (supra)*. Indeed, if an outsider owed a duty to shareholders to refrain from trading, there would have been no need for the adoption of the misappropriation theory; Mr. O'Hagan would have had the same duty as an officer of the shareholders' corporations.

To establish larceny by false pretenses based upon a failure to disclose, there must exist a duty requiring that the information at issue be provided to the party whose property is being obtained. No such duty has been demonstrated here.

We note that in *People v Sala* (258 AD2d 182, *affd* 95 NY2d 254) the Third Department asserted that a false pretenses larceny conviction may rest merely on material omissions or concealed information. However, the Court of Appeals, in affirming, specifically declined to reach the issue, in view of the unexcepted-to jury charge on that point. Furthermore, in that case the defendants had made direct representations to the investors, which included many falsehoods as well as certain omissions.

Finally, although misrepresentations have sometimes been said to have been made by conduct (*see*, *People v King*, 85 NY2d 609 [car salesman, by driving car to customer's business and offering to sell it to her, was making a representation that he owned it]), it is too great a stretch to view an anonymous purchase of shares of stock as encompassing the implicit representation that the buyer has no wrongfully obtained confidential inside information.

While defendant did violate a duty, and therefore was properly found guilty of committing fraud in engaging in inducing or promoting the sale of securities, based upon the extension of the duty Baridis owed to Smith Barney, he cannot properly be said to have stolen the shares of stock he purchased, since he had no duty toward the world in general, or the owners of the stock in particular, to "disclose the information or refrain from trading." Under existing law, that duty would only apply to corporate insiders; as noted, defendant was not such an insider. Consequently, neither the shares defendant purchased, nor the profits they eventually paid, may be termed stolen property.

Because the conviction of fourth-degree conspiracy was based upon the intended commission of second-degree larceny or second-degree criminal possession of stolen property, this count must fall as well.

*Scheme to Defraud*

A similar problem is presented with respect to the two "scheme to defraud" counts and the analogous Martin Act count of which defendant was convicted. Although the evidence demonstrates the commission of a fraud, it does not demonstrate that the people who were defrauded were those whose property was obtained by defendant.

The Martin Act count pursuant to section 352-c (5) charges defendant with the commission of a "scheme constituting a systematic ongoing course of conduct *with intent to defraud ten*

*or more persons*" (emphasis added) where property is obtained from at least one such person, while engaged in inducing or promoting the sale or purchase of securities. The "scheme to defraud" provisions of the Penal Law with which defendant was charged employ the same language, except that they lack the element of engaging in inducing or promoting the sale or purchase of securities. Penal Law § 190.65 (1) (a) prohibits a "scheme constituting a systematic ongoing course of conduct *with intent to defraud ten or more persons*" (emphasis added) where property is obtained from one or more such persons, while subdivision (1) (b) prohibits a "scheme constituting a systematic ongoing course of conduct *with intent to defraud more than one person*" (emphasis added) where property with a value of over $1,000 is obtained from one or more such persons.

Inasmuch as it has already been established that defendant engaged, with others, in a course of conduct involving intentional fraud, while engaged in inducing or promoting the sale or purchase of securities, the only question remaining is determining whether defendant may be said to have intended to defraud the persons from whom he obtained property.

Under the common law, a person defrauds another by making a misrepresentation of fact in order to induce the other to act or refrain from acting, when that person is harmed as a result of his justifiable reliance upon the misrepresentation (*see*, Restatement [Second] of Torts § 525, at 55; *see also, Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 407). As discussed above in connection with larceny by false pretenses, an omission alone may substitute for a misrepresentation to establish a fraud, *if* the defendant had a duty to disclose that which was omitted.

The People assert that unlike larceny by false pretenses, the Penal Law definition of scheme to defraud carries with it no obligation to demonstrate reliance by the victim upon the misrepresentation or omission, but rather, focuses on whether the defendant intended to defraud others through his conduct. But the real problem here is whether the people whose stock defendant obtained are the people defendant can be said to have intended to defraud.

As the *O'Hagan* Court observed in connection with Federal securities law, when an "outsider" uses the confidential information to purchase securities,

> "the person or entity defrauded *is not the other party to the trade*, but is, instead, the source of the

nonpublic information. * * * A misappropriator who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he *deceives the source of the information* and simultaneously harms members of the investing public." (521 US at 656, *supra* [emphasis added].)

The fact that people are harmed by a scheme does not in itself establish that it was these people who were being defrauded (*see, O'Hagan, supra*; *People v Mikuszewski*, 73 NY2d 407, 413). In the *Mikuszewski* case, the defendant was shown to have engaged in a fraudulent bidding scheme; but the People failed to offer evidence tending to show that defendant intended to, or did, defraud the other bidding contractors who might otherwise have been awarded the contracts (*id.* at 413). The Court explained that

"while the People's evidence * * * may have been sufficient to establish that the one 'person' from whom property was actually obtained was the government or a few units of the government, there was absolutely no evidence that defendants made false representations to other bidding contractors, or even that other bidding contractors had knowledge of the false representations made to the government or that they were in any way defrauded of property rights or interests." (*Id.*)

The same problem is presented with respect to the issue of whether the stock purchased by defendant could properly be considered stolen property: defendant neither made false representations to the shareholders, nor did he omit to disclose to them something he had a duty to disclose to them. Thus, while defendant's conduct clearly amounts to securities fraud, as defined in General Business Law § 352-c (6), it does not fall within the category of a scheme to defraud with the intent to defraud ten persons, or even the intent to defraud anyone other than Smith Barney.

Accordingly, I would modify so as to vacate the convictions for criminal possession of stolen property in the second degree, scheme to defraud in the first degree, conspiracy and violation of General Business Law § 352-c (5), and otherwise affirm.

ROSENBERGER, J. P., and MAZZARELLI, J., concur with ANDRIAS, J.; TOM and SAXE, JJ., dissent in part in a separate opinion by SAXE, J.

Judgment, Supreme Court, New York County, rendered February 23, 2000, affirmed. Motion to strike reply brief granted

to the extent of deeming point II A. stricken. Cross motion for coram nobis relief dismissed as premature. Motion to reargue bail application denied.